## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARLON BOLTON, JENNY PTASZEK, GINA BILOTTA, VERONICA MALDONADO, JOHN WRIGHT, MARGARET VASQUEZ, TRACEY DROTOS, and SCOTT MARTIN, on behalf of themselves and all others similarly situated, | No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| FORD MOTOR COMPANY, | <u>**CLASS ACTION COMPLAINT**</u> |
| Defendant. | |

Plaintiffs Marlon Bolton, Jenny Ptaszek, Gina Bilotta, Veronica Maldonado, John Wright, Margaret Vasquez, Tracey Drotos, and Scott Martin ("Plaintiffs") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendant Ford Motor Company ("Ford").

### <u>INTRODUCTION</u>

1.    The Ford 1.0L EcoBoost engine is a one liter, 3-cylinder engine used in several models of economy, subcompact and compact cars manufactured by Ford.  Unfortunately, these engines have an inherent defect related to the oil pump, about which Ford has known but not disclosed to consumers. This defect results in catastrophic engine failure, often shortly outside of the 60,000-mile powertrain warranty as demonstrated below.

2.    The defect presents a serious safety hazard because it can cause catastrophic engine failure without warning while driving, lost motive power, and/or sudden limp mode activation, increasing the likelihood of a collision. Moreover, because Ford is aware that the failures – which attract the owners' notice – occur frequently just outside the warranty, it is unfairly transferring the cost of the warranty repairs to unsuspecting consumers of the economy vehicles in which these engines are equipped.

3.      This is a class action brought against Ford by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of model year 2016 or later Ford-brand vehicles equipped with a 1.0L EcoBoost engine ("Class Vehicles"), including 2016-2017 Ford Fiesta vehicles, 2018-2021 Ford EcoSport vehicles and 2016-2018 Ford Focus vehicles.

4.      With Manufacturer Suggested Retail Prices ("MSRPs") starting around $16,000 for the Fiesta, $20,000 for the Ecosport, and $18,000 for the Focus, Ford marketed the subcompact and compact Class Vehicles towards budget-minded consumers.

5.      In brochures and other advertising materials, Ford consistently touted the "award winning" EcoBoost engine as "A turbo-charged wonder, the award-winning 1.0L EcoBoost engine offers an impressive combination of driveability and fuel efficiency."

6.      Ford failed to disclose, however, the fact that the engines equipped in the Class Vehicles are, as described by one Ford Dealership employee, "time bombs" due to a defect that prevents oil from circulating properly that destroys the engine, leaving consumers with a repair bill that frequently exceeds the value of the vehicle.  Specifically, the 1.0L EcoBoost engines have manufacturing, workmanship, and/or design defects which lead to a loss of oil pressure and an oil pump failure, causing the oil in the vehicle to slow or stop circulating, increasing engine temperature beyond specifications, and subsequently, causing the engine to seize (the "Oil Pump Defect" or "Defect"). Discovery will show that the Oil Pump Defect is the result of defective engine oil pump belt tensioners, which are prone to premature failure and do not meet industry or manufacturer standards.

7.      Plaintiffs and Class member are often unable to determine that their vehicles suffer from the Defect until the engine malfunctions while their vehicle is being driven, creating a significant safety hazard. Symptoms of the Defect include abnormal noise coming from the engine compartment, increasing engine temperature, and a drop in oil pressure. If the driver is lucky, the low oil pressure warning light will illuminate, giving them time to pull over to the side of the road. However, the Defect can also cause the engine to stall or fail without warning, or put the vehicle into "limp mode," causing the vehicle to decelerate or stop suddenly in the middle of traffic.

8.      The Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.  Each of the 1.0L EcoBoost engines installed in the Class Vehicles is identical or substantially similar, in that Ford made no material changes to the engines over the years or by model.[1]

9.      Ford has been aware of the Defect for years, as evidenced by several manufacturer communications and technical service bulletins ("TSBs") and large numbers of consumers who have complained about this Defect dating back to at least 2016, including when consumers brought their Class Vehicles to Ford's authorized dealers for repairs, complained to Ford directly via the customer service department, or complained to the National Highway Transportation Safety Administration ("NHTSA").

10.     Despite Ford's knowledge of the Defect, which renders the Class Vehicles hazardous and unsuitable for their intended purpose, it has failed to provide adequate repairs under warranty, and has also failed to disclose the Defect to unsuspecting consumers.

11.     Due to the undisclosed Oil Pump Defect, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Ford vehicles.  These customers continue to have to live with the risks of their vehicles stalling in the middle of traffic, potential engine failure and costly replacements, and diminution of value of their vehicles. Plaintiffs accordingly seek relief both for themselves and for other current and former owners or lessees of these Class Vehicles.

**JURISDICTION AND VENUE**

12.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Ford, the number of proposed class members

---

[1] For example, Ford often issues technical service bulletins for all vehicles with this particular engine, regardless of model or model year, for a variety of known issues.  This includes a separate known defect of the 1.0 EcoBoost engine in which coolant escapes from the engine, causing catastrophic engine damage.  At least one bulletin regarding this issue was issued on October 15, 2018, directed at vehicles with the 1.0 EcoBoost engine including 2014-2017 Fiesta, 2015-2018 Focus, 2018-2019 Ecosport vehicles entitled "SSM 47587."

exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

13.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.  Further, this Court may also exercise supplemental jurisdictions over Plaintiffs' Magnuson-Moss Warranty Act claims.

14.     This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as Ford is "at home" in Delaware.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue Ford in this District, Ford's state of incorporation.

## <u>PARTIES</u>

### I.     **Plaintiffs**

### <u>**Plaintiff Marlon Bolton**</u>

16.     Plaintiff Marlon Bolton is domiciled in and is a citizen of Goergia.

17.     On September 22, 2018, Plaintiff Bolton purchased a new 2018 Ford EcoSport equipped with a 1.0L EcoBoost engine from Westway Ford, an authorized Ford dealership located in Irving, Texas.

18.     Plaintiff Bolton purchased his vehicle for personal, family, or household use.

19.     Passenger safety and reliability were important factors in Plaintiff Bolton's decision to purchase his vehicle.  Before making his purchase, Plaintiff Bolton researched the details about

the vehicle by perusing Ford's corporate website and the website hosted by his dealership at the time Westway Ford. He also reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component, spoke to a representative of the authorized Ford dealership who assured his of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Bolton selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

20.     None of the information provided to Plaintiff Bolton disclosed any defects in the engine or the powertrain system.  Ford's omissions were material to Plaintiff Bolton.

21.     Had Ford disclosed the Defect before Plaintiff Bolton purchased his vehicle, he would have seen such disclosures and been aware of them. Indeed, Ford's misstatements and omissions were material to Plaintiff Bolton. Like all members of the Class, Plaintiff Bolton would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

22.     In addition, at the time Plaintiff Bolton purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Ford and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Bolton relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

23.     At all times during his ownership of the vehicle, Plaintiff Bolton properly maintained and serviced his Class Vehicle according to Ford's recommended maintenance guidelines.

24.     On September 3, 2022, when his vehicle had approximately 64,000 miles on the odometer, the oil pressure light illuminated on his dashboard while driving. Within ten minutes of

the warning, his vehicle entered into limp mode, forcing him to quickly pull over to the side of the road to avoid a collision. The car's engine had completely seized, preventing him from starting it up again. His car was towed the same day to Courtesy Ford Lincoln, an authorized Ford dealership located in Portland, Oregon.

25.    Following their initial inspection, the service technician at the dealership diagnosed the issue as engine failure caused by an oil pump failure. Plaintiff Bolton was informed that he would be responsible for covering the costs of the engine replacement.  The preliminary estimate of the total cost was $6,700.

26.    Plaintiff Bolton contacted Ford directly about the engine replacement via phone on or about September 13, 2022. Following some negotiation with the customer service department of Ford, Ford agreed to cover some of the cost of the engine, but Plaintiff Bolton was forced to pay $2,387.03 out of pocket for the engine replacement.

27.    Due to the difficulty of sourcing a new engine, as well as the time involved in installing a new engine, Plaintiff Bolton was without his vehicle for two months.  As such, he incurred costs for alternative transportation including Lyft rides totaling approximately $342.87. Moreover, his vehicle insurance provider, Farmer's Insurance, initially provided rental assistance while they evaluated a claim Plaintiff Bolton filed.  However, after determining the cause of the problems with Plaintiff Bolton's vehicle were a manufacturer defect, the insurance company declined all coverage and revoked its rental assistance.

28.    On October 31, 2022, Plaintiff Bolton's vehicle was returned to him after being held at the dealership for approximately eight weeks.

29.    Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in his vehicle.  To date, Plaintiff Bolton has received no notification from Ford about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

30.     As a result of the Defect, Plaintiff Bolton has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Bolton will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although he would like to do so.

31.     At all times, Plaintiff Bolton, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner that it was intended to be used.

32.     Additionally, as a result of the Defect, Plaintiff Bolton has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of his vehicle, and lost time. Plaintiff Bolton's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff Jenny Ptaszek**

33.     Plaintiff Jenny Ptaszek is domiciled in and is a citizen of Michigan.

34.     In or around August 2018, Plaintiff Ptaszek purchased a new 2018 Ford EcoSport equipped with a 1.0L EcoBoost engine from Suburban Ford, an authorized Ford dealership located in Waterford, Michigan.

35.     Plaintiff Ptaszek purchased her vehicle for personal, family, or household use.

36.     Passenger safety and reliability were important factors in Plaintiff Ptaszek's decision to purchase her vehicle.  Before making her purchase, Plaintiff Ptaszek reviewed details about vehicle contained on both Ford's website and websites for several Ford dealerships, along with various paper flyers. She also reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component, spoke to a representative of the authorized Ford dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased.  Plaintiff Ptaszek selected and ultimately purchased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle

capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

37.   None of the information provided to Plaintiff Ptaszek disclosed any defects in the engine or the powertrain system.  Ford's omissions were material to Plaintiff Ptaszek.

38.   Had Ford disclosed the Defect before Plaintiff Ptaszek purchased her vehicle, she would have seen such disclosures and been aware of them. Indeed, Ford's misstatements and omissions were material to Plaintiff Ptaszek.  Like all members of the Class, Plaintiff Ptaszek would have not purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

39.   In addition, at the time Plaintiff Ptaszek purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Ford and its authorized dealership that she saw during her internet research, read in promotional material disseminated by Ford, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Ptaszek relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

40.   At all times during her ownership of the vehicle, Plaintiff Ptaszek properly maintained and serviced her Class Vehicle according to Ford's recommended maintenance guidelines.

41.   On January 14, 2023, when her vehicle had approximately 60,705 miles on the odometer, the oil pressure light illuminated on the dashboard while her husband was driving the vehicle, forcing him to pull over to the side of the road and confirm that the oil level on the dipstick was not low. He drove the vehicle to Bell Tire in Chesterfield, Michigan, who advised him to have the car towed to the nearest Ford dealership. Plaintiff Ptaszek's vehicle was towed to Suburban Ford that same day.  The dealership diagnosed the vehicle having a failed oil pump which had damaged the engine such that an engine replacement was required.

42.     Despite being within the time limitations of the warranty and barely over the mileage limitation by only 705 miles, Plaintiff Ptaszek was informed that she would be responsible for covering the costs of the engine replacement and that warranty coverage would not apply.  The preliminary estimate of the total cost came out to around $6,270.99, which did not include the cost to have the car towed to the dealership. The dealership reached out to Ford corporate on her behalf to ask about financial assistance towards the repair costs, but Ford declined to cover any of the costs.

43.     On February 23, 2023, the dealership returned the vehicle to Plaintiff Ptaszek after approximately 5 weeks due to difficulty in sourcing the engine.

44.     Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in her vehicle. To date, Plaintiff Ptaszek has received no notification from Ford about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

45.     As a result of the Defect, Plaintiff Ptaszek has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Ptaszek will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although she would like to do so.

46.     At all times, Plaintiff Ptaszek, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

47.     Additionally, as a result of the Defect, Plaintiff Ptaszek has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Ptaszek's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff Gina Bilotta**

48.     Plaintiff Gina Bilotta is domiciled and is a citizen of New Jersey.

49.     On May 15, 2019, Plaintiff Bilotta purchased a new 2019 Ford EcoSport equipped with a 1.0L EcoBoost engine at Chapman Ford, an authorized Ford dealership located in Philadelphia, Pennsylvania.

50.     Plaintiff Bilotta purchased her vehicle for personal, family, or household use.

51.     Passenger safety and reliability were important factors in Plaintiff Bilotta's decision to purchase her vehicle.  Before making her purchase, Plaintiff Bilotta reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component and test drove the vehicle she ultimately purchased.

52.     None of the information provided to Plaintiff Bilotta disclosed any defects in the engine or the powertrain system. Ford's omissions were material to Plaintiff Bilotta.

53.     Had Ford disclosed the Defect before Plaintiff Bilotta purchased her vehicle, she would have seen such disclosures and been aware of them. Indeed, Ford's misstatements and omissions were material to Plaintiff Bilotta.  Like all members of the Class, Plaintiff Bilotta would have not purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

54.     In addition, at the time Plaintiff Bilotta purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Ford and its authorized dealership that she reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Bilotta relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

55.     At all times during her ownership of the vehicle, Plaintiff Bilotta properly maintained and serviced her Class Vehicle according to Ford's recommended maintenance guidelines.

56.     In or around November 2022, when the vehicle had approximately 56,000 miles on the odometer, the powertrain warning light began flashing on her dashboard while she was driving on the highway. She pulled her car to the side of the road, turned it off and re-started it, and the warning light disappeared.

57.     When the powertrain warning light began appearing at least two to three times during a given week, she brought her car into Chapman Ford. Her dealership ran a diagnostic and did not find any Diagnostic Trouble Codes indicating that the engine's control module recorded a problem.  The dealership concluded that there was nothing they could do until something else was to happen as result of the warning light going off. She checked with Protech as well, a third-party repair shop located in Philadelphia, Pennsylvania, who made the same assessment as Chapman Ford that there was nothing else that could be done unless something else were to happen with the vehicle besides the light coming-on.

58.     On or around February 12, 2023, when her vehicle had approximately 64,000 miles on the odometer, the oil pressure light illuminated on her dashboard while driving home from work over the Walt Whitman Bridge. She managed to get her car safely across the bridge before pulling it to the side of the road.

59.     The vehicle was towed to Holman Ford, an authorized Ford dealership located in Turnersville, New Jersey. The service technicians at the dealership examined the engine and found debris within the engine from the deteriorated oil pump belt, as well as metal shavings resulting from metal-on-metal damage due to insufficient oil circulation within the engine.  Due to the poor oil circulation, debris, and metal shavings, the engine suffered catastrophic failure and required replacement. Plaintiff Bilotta was told she would be responsible for covering the costs of the engine replacement. The preliminary estimate of the total cost came out to around $8,648 before tax.

60.     Unable to afford the repair, Plaintiff Bilotta contacted Ford to ask for assistance in paying for the repair. Ford refused. Plaintiff Bilotta then had her car towed to ProTech. Their estimate for an engine replacement totaled $6,208.52.

61.     On March 2, 2023, Plaintiff's vehicle was returned after having a replacement engine installed by Protech. The repair took approximately 2.5 weeks and for approximately 2.5 weeks and Plaintiff Bilotta paid $994.72 at her own expense for a rental vehicle for alternate transportation during that time.

62.     Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in her vehicle. To date, Plaintiff Bilotta has received no notification from Ford about any potential permanent repair or modification or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

63.     As a result of the Defect, Plaintiff Bilotta has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Bilotta will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although she would like to do so.

64.     At all times, Plaintiff Bilotta, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

65.     Additionally, as a result of the Defect, Plaintiff Bilotta has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Bilotta's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff Veronica Maldonado**

66.     Plaintiff Veronica Maldonado is domiciled in and a citizen of California.

67.     On or around October 2018, Plaintiff Maldonado leased a new 2018 Ford EcoSport from Ford of Upland, an authorized Ford dealership located in Upland, California.

68.     Following the expiration of her lease, Plaintiff Maldonado purchased her vehicle outright.

69.     Plaintiff Maldonado purchased her vehicle for personal, family, or household use.

70.     Passenger safety and reliability were important factors in Plaintiff Maldonado's decision to purchase her vehicle.  Before making her purchase, Plaintiff Maldonado reviewed Ford's website that featured representations and details about the vehicle, reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component, spoke to a representative of the authorized Ford dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased.  Plaintiff Maldonado selected and ultimately purchased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

71.     None of the information provided to Plaintiff Maldonado disclosed any defects in the engine or the powertrain system.  Ford's omissions were material to Plaintiff Maldonado.

72.     Had Ford disclosed the Defect before Plaintiff Maldonado purchased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Ford's misstatements and omissions were material to Plaintiff Maldonado. Like all members of the Class, Plaintiff Maldonado would have not purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

73.     In addition, at the time Plaintiff Maldonado purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Ford and its authorized dealership that she saw during her internet research, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Maldonado relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

74.     At all times during his ownership of the vehicle, Plaintiff Maldonado properly maintained and serviced her Class Vehicle according to Ford's recommended maintenance guidelines.

75.     On March 17, 2022, Plaintiff Maldonado, when her vehicle had approximately 65,000 miles on the odometer,  noticed a knocking noise on her drive home from work. The next morning when she was on her way to the shop for the knocking noise, the noise got much louder and the vehicle's low oil light illuminated. Plaintiff Maldonado then had the vehicle towed to a local independent mechanic, Bertino Automotive Services, located in Rancho Cucamonga, California, to avoid the risk of driving and causing damage to her engine. The mechanic drained the vehicle's oil pan and found rock-sized pieces of the engine in the oil, indicating that the engine had already suffered catastrophic damage and failure. She was informed that the entire engine would need to be replaced due to an oil pump failure.

76.     Following their diagnosis, Plaintiff Maldonado had the vehicle towed to Ford of Upland, which performed a diagnostic process and said the entire engine did need to be replaced due to an oil pump failure.  The initial quote for the replacement engine was $5,000. Ford agreed to pay $3,000 of the cost, leaving Plaintiff Maldonado to pay $2,000. However, when Plaintiff Maldonado went to pick her vehicle up, the dealership charged her another $375 for parts not included in the initial quote and not covered by Ford.  As a result, Plaintiff Maldonado paid $2,375 for the attempted repair to the vehicle.

77.     On May 13, 2022, Plaintiff Maldonado retrieved her vehicle from the dealership, after nearly four weeks.

78.     Since the attempted repair, Plaintiff Maldonado has returned her vehicle to Ford of Upland several times due to the check engine light illuminating sporadically.  Each time, she was told "it was probably a faulty signal issue," but no repairs were attempted.

79.     Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in her vehicle.  To date, Plaintiff Maldonado has received no notification from Ford about any potential permanent repair or modification, or change to the

maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

80.     As a result of the Defect, Plaintiff Maldonado has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Maldonado will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although she would like to do so.

81.     At all times, Plaintiff Maldonado, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

82.     Additionally, as a result of the Defect, Plaintiff Maldonado has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Maldonado's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff John Wright**

83.     Plaintiff Wright is domiciled in and is a citizen of Maryland.

84.     On or around July 27, 2020, Plaintiff Wright purchased a used 2019 Ford EcoSport equipped with a 1.0L EcoBoost engine with approximately 31,282 miles on the odometer from Offlease Only, a used car dealer located in West Palm Beach, Florida.

85.     Plaintiff Wright purchased his vehicle for business purposes, as he owns and manages a driving school.

86.     Passenger safety and reliability were important factors in Plaintiff Wright's decision to purchase his vehicle.  Before making his purchase, Plaintiff Wright reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component and other pertinent details about the vehicle supplied on Offlease's website.  He has also been a longtime owner of various Ford vehicles over the last few decades. Plaintiff Wright selected and ultimately

purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

87.     None of the information provided to Plaintiff Wright disclosed any defects in the engine or the powertrain system.  Ford's omissions were material to Plaintiff Wright.

88.     Had Ford disclosed the Defect before Plaintiff Wright purchased his vehicle, he would have seen such disclosures and been aware of them.  Indeed, Ford's misstatements and omissions were material to Plaintiff Wright.  Like all members of the Class, Plaintiff Maldonado would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

89.     In addition, at the time Plaintiff Wright purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Ford and information found on both the Monroney sticker and Offlease's website that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Wright relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

90.     At all times during his ownership of the vehicle, Plaintiff Wright properly maintained and serviced his Class Vehicle according to Ford's recommended maintenance guidelines.

91.     In May of 2022, when the vehicle had approximately 62,000 miles on the odometer, the oil pressure light illuminated on the dashboard along with several other system warning lights while Plaintiff Wright was driving the vehicle. He pulled over the vehicle to the side of the road and subsequently, the engine failed to restart. He had the vehicle towed to Safford Ford, an authorized Ford dealership located in Salisbury, Maryland.

92.     Following an inspection, the technician at the dealership provided an engine failure diagnosis.  The engine failed due to a shredded oil pump belt.  Despite being just 2,000 miles over 60,000 miles Ford did not cover his replacement engine.  Plaintiff Wright paid $6,398 for a replacement engine.

93.     Plaintiff Wright also incurred additional out of pocket costs including but not limited to $100 for towing costs.

94.     Plaintiff Wright was without his vehicle for approximately two months due to difficulty of the dealership in getting a new engine.

95.     Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in his vehicle.  To date, Plaintiff Wright has received no notification from Ford about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

96.     As a result of the Defect, Plaintiff Wright has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Wright will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although he would like to do so.

97.     At all times, Plaintiff Wright, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

98.     Additionally, as a result of the Defect, Plaintiff Wright has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of his vehicle, and lost time. Plaintiff Wrights' vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff Margaret Vasquez**

99.     Plaintiff Margaret Vasquez is domiciled in and a citizen of Texas.

100.    In or around November 2019, Plaintiff Vasquez purchased a new 2019 Ford EcoSport equipped with a 1.0L EcoBoost engine from Stanley Ford, an authorized dealership located in Sweetwater, Texas.

101.    Plaintiff Vasquez purchased her vehicle for personal, family, or household use.

102.    Passenger safety and reliability were important factors in Plaintiff Vasquez's decision to purchase her vehicle.  Before making her purchase, Plaintiff Vasquez reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component, spoke to a representative of the authorized Ford dealership who assured her of the quality, safety, and reliability of the vehicle, and test drove the vehicle she ultimately purchased.  Plaintiff Vasquez selected and ultimately purchased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

103.    None of the information provided to Plaintiff Vasquez disclosed any defects in the engine or the powertrain system.  Ford's omissions were material to Plaintiff Vasquez

104.    Had Ford disclosed the Defect before Plaintiff Vasquez purchased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Ford's misstatements and omissions were material to Plaintiff Vasquez.  Like all members of the Class, Plaintiff Vasquez would have not purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

105.    In addition, at the time Plaintiff Vasquez purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Ford and its authorized dealership that she heard from the salesperson and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Vasquez relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

106.    At all times during his ownership of the vehicle, Plaintiff Vasquez properly maintained and serviced her Class Vehicle according to Ford's recommended maintenance guidelines.

107.    On or around March 11, 2023, when her car had approximately 79,300 miles on the odometer, the oil pressure light illuminated on her dashboard while traveling to Illinois. The vehicle completely died when she was trying to make it to the nearest gas station.  She paid $65 out-of-pocket initially to get it towed to Stanley Ford. Her car insurance payments went up by $200 as result of the towing. Then on March 12, 2023, she rented a U-Haul for $500 to transport her vehicle to a third-party mechanic shop, Dempsey Auto Repair, located in Abilene, Texas. The mechanic there told her the entire engine needed to be replaced as result of an oil pump failure.

108.    The preliminary estimate of the total cost came out to around $7,555 by her mechanic.

109.    She reached out to Ford to inquire about getting financial support towards the repair costs, but Ford declined to pay any amount towards the repair cost and instead informed her that their quote for the out-of-warranty engine replacement would be between $10,000-$12,000. Plaintiff Vasquez ended up getting her vehicle repaired by the third-party repair shop due to a lower bid for the repair cost. In total, she spent approximately $8,000 out-of-pocket for the repairs and other related expenses.

110.    While the repairs were in-process, Plaintiff Vasquez was without a vehicle for nearly three weeks.

111.    On March 29, 2023, Plaintiff Vasquez's vehicle was returned after being held at Dempsey Auto for nearly three weeks.

112.    Had Ford disclosed the Oil Pump Defect, Plaintiff Vasquez would not have purchased her Class Vehicle or would have paid significantly less for it.

113.    Additionally, as a result of the Defect, Plaintiff Vasquez has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Vasquez's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

114.    Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in her vehicle.  To date, Plaintiff Vasquez has received no notification from Ford about any potential permanent repair or modification or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

115.    As a result of the Defect, Plaintiff Vasquez has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Vasquez will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although she would like to do so.

116.    At all times, Plaintiff Vasquez, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

117.    Additionally, as a result of the Defect, Plaintiff Vasquez has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Vasquez's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff Tracey Drotos**

118.    Plaintiff Drotos is domiciled in and is a citizen of Michigan.

119.    In or around August 2019, Plaintiff Drotos leased a 2019 Ford EcoSport equipped with a 1.0L EcoBoost engine from Varsity Ford located in Ann Arbor, Michigan.

120.    Plaintiff leased her vehicle for personal, family, or household use.

121.    Passenger safety and reliability were important factors in Plaintiff Drotos's decision to lease her vehicle.  Before entering into her lease, Plaintiff Drotos reviewed details about the vehicle on Ford's website and a brochure that was mailed to her home. She also reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component, spoke to a representative of the authorized Ford dealership who assured her of the quality, safety,

and reliability of the vehicle, and test drove the vehicle she ultimately leased.  Plaintiff Drotos selected and ultimately leased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

122.    None of the information provided to Plaintiff Drotos disclosed any defects in the engine or the powertrain system.  Ford's omissions were material to Plaintiff Drotos.

123.    Had Ford disclosed the Defect before Plaintiff Drotos leased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Ford's misstatements and omissions were material to Plaintiff Drotos.  Like all members of the Class, Plaintiff Drotos would have not leased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

124.    In addition, at the time Plaintiff Drotos leased her vehicle, and in leasing her vehicle, she relied upon representations from Ford and its authorized dealership that she saw during her internet research, read in promotional material disseminated by Ford, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Drotos relied on those representations and the omission of the disclose of the Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

125.    At all times during his ownership of the vehicle, Plaintiff Drotos properly maintained and serviced her Class Vehicle according to Ford's recommended maintenance guidelines.

126.    On or around March 21, 2023, when her car had approximately 65,000 miles on the odometer, the oil pressure light illuminated on her dashboard. She managed to get the car to Varsity Ford where it was inspected. The inspection found that the oil pump belt tensioner had failed, requiring an engine replacement.

127.    Plaintiff Drotos was informed she would be responsible for covering the costs of the engine replacement.  The total repair cost was estimated at $5,612.31

128.    While the repairs were in-process, Plaintiff Drotos was without a vehicle for nearly two weeks.

129.    On or about April 4, 2023, Plaintiff Drotos's vehicle was returned after being held at the dealership for approximately two weeks.

130.    On or about April 24, 2023, Plaintiff Drotos sent a letter via certified mail to Ford Corporate to inquire about getting financial coverage for the money spent out-of-pocket on the repair. Ford offered $5,000 towards the overall repair costs. Plaintiff Drotos was still responsible for the remaining $612.31.

131.    Had Ford disclosed the Oil Pump Defect, Plaintiff Drotos would not have leased her Class Vehicle or would have paid significantly less for it.

132.    Additionally, as a result of the Defect, Plaintiff Drotos has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Droto's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

133.    Because the Defect is inherent in the engine, the replacement engine suffers from same Defect as the original engine in her vehicle.  To date, Plaintiff Drotos has received no notification from Ford about any potential permanent repair or modification or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing damage to the new engine.

134.    As a result of the Defect, Plaintiff Drotos has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Drotos will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase or lease another Class Vehicle although she would like to do so.

135.     At all times, Plaintiff Drotos, like all Class Members, has attempted to drive her Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

136.     Additionally, as a result of the Defect, Plaintiff Drotos has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of her vehicle, and lost time. Plaintiff Drotos's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

**Plaintiff Scott Martin**

137.     Plaintiff Scott Martin is domiciled in and is a citizen of Florida.

138.     On April 3, 2019, Plaintiff Martin purchased a new 2018 Ford EcoSport equipped with a 1.0L EcoBoost engine from Kisselback Ford located in Saint Cloud, Florida.

139.     Plaintiff Martin purchased his vehicle for personal, family, or household use.

140.     Passenger safety and reliability were important factors in Plaintiff Martin's decision to purchase his vehicle.  Before making his purchase, Plaintiff Martin reviewed the window sticker (the "Monroney" sticker) which listed the 1.0L EcoBoost engine as a component, spoke to a representative of the authorized Ford dealership who assured his of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Martin selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

141.     None of the information provided to Plaintiff Martin disclosed any defects in the engine or the power train system.  Ford's omissions were material to Plaintiff Martin.

142.     Had Ford disclosed the Defect before Plaintiff Martin purchased his vehicle, he would have seen such disclosures and been aware of them.  Indeed, Ford's misstatements and omissions were material to Plaintiff Martin.  Like all members of the Class, Plaintiff Martin would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

143.     In addition, at the time Plaintiff Martin purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Ford and its authorized dealership that he heard from the salesperson and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Martin relied on those representations and the omission of the disclose of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

144.     On March 31, 2022, when his vehicle had approximately 65,000 miles on the odometer, the oil pressure light illuminated on his dashboard while he was driving on a busy highway, forcing him to cautiously decelerate his vehicle and maneuver it to the side of the road. Plaintiff Martin is on active duty for the National Guard and was heading to an assignment at time, but he was forced to call and cancel due to his vehicle's unexpected engine failure. A tow truck transported his car to the closest authorized Ford dealership, Kisselback Ford, located about approximately 35 miles away.

145.     After inspecting the vehicle, the dealership confirmed that the vehicle had experienced an oil pump tensioner failure that had caused the vehicle's engine to fail. He was informed that he would be required to pay approximately $8,200 out-of-pocket for the complete engine replacement needed to remedy the issue.

146.     Rather than pay $8,200 for the engine repair, Plaintiff Martin ended up trading-in his Ford EcoSport vehicle back to his dealership at an estimated $3,000-$5,000 loss. To replace the Ford EcoSport vehicle, he ended up purchasing a Honda CR-V Hybrid vehicle.

147.     Until and unless, Ford fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Martin will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although he would like to do so.

148.     At all times, Plaintiff Martin, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

149.    Additionally, as a result of the Defect, Plaintiff Martin has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of his vehicle, and lost time. Plaintiff Martin's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

## II.    Defendant

150.    Ford Motor Company is a Delaware limited liability company with its corporate headquarters located at 1 American Road, Dearborn, Michigan 48126.  Ford Motor Company is registered to do business in the State of Delaware.  Ford designs, manufacturers, markets, and distributes motor vehicles, parts, and other automotive products for sale in the United States and throughout the world.  Ford is the warrantor and distributor of the Class Vehicles in Delaware and throughout the United States.

151.    At all relevant times, Ford is engaged in the business of designing, manufacturing, constructing, assembling, warranting, marketing, advertising, distributing, and selling vehicles and motor vehicle components, including the Class Vehicles, under the "Ford", "Lincoln", and other brand names in Delaware and throughout the United States of America.

152.    In order to sell vehicles to the general public, Ford enters into agreements with dealerships who are then authorized to sell Ford vehicles to consumer such as Plaintiff.  In return for the exclusive right to sell new Ford vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers.  These contracts give Defendant a significant amount of control over the actions of the dealerships, including sales and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to Ford's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents.  Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

153.    Ford also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.  Ford is also responsible for the production and content of the information on the Moroney Stickers.

154.    Ford also develop and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Ford is also responsible for the production and content of the information on the Moroney Stickers.

## FACTUAL ALLEGATIONS

155.    For years, Ford has designed, manufactured, distributed, sold, leased, and warranted the Class Vehicles.

156.    Ford marketed and sold thousands of Class Vehicles nationwide, including through its nationwide network of authorized dealers and service providers.  Ford sells its vehicles through its authorized dealerships.  After these dealerships sell cars to consumers, including Plaintiffs and Class Members, they acquire additional vehicles inventory from Ford to replace the vehicle sold, increasing Ford's revenues.  Ford also sells replacement parts to its dealerships for use to service, maintain, and repair vehicles, including the Class Vehicles.  Thus, Plaintiffs' and Class Members' purchase of Class Vehicles and their replacement parts accrues to the benefit of Ford by increasing its revenues. In 2022, Ford reported its North American revenues was $87 billion.[2]

### I.  Ford's Statements About the 1.0L Ecoboost

157.    Ford advertises and emphasizes the engineering of the 1.0L EcoBoost in the Class Vehicles, continually referring to the engine as "an impressive combination of drivability and fuel efficiency."  In fact, "driveability and efficiency" is Ford's constant refrain in describing the functionality of the 1.0L EcoBoost as these brochures for the Ford Focus from model years 2016 to 2018 demonstrate:

---

[2] *See* 2022 Ford Annual Report.



# Experience ingenuity.

1.0 liter of displacement. 3 cylinders. 215 pounds. From these specs, the 1.0L EcoBoost® engine¹ offers cutting-edge engineering.

**With 125 lb.-ft. of torque**, the 1.0L EcoBoost is teamed with a 6-speed manual transmission for 123 horsepower of maximum driving fun. Or you can choose an available 6-speed SelectShift® automatic. This award-winning performer has been named the best engine under 1.0L, according to *Engine Technology International.*² It combines direct injection, turbocharging and twin independent variable camshaft timing (TI-VCT) to generate a broad, flat torque curve. And provide you with an impressive combination of driveability and fuel efficiency (an EPA-estimated 42 hwy mpg with the manual transmission).³

158.    This mimics the claims about the "driveability and efficiency" 1.0L EcoBoost engines in the Ford EcoSport.  But contrary to these assertions, vehicles with the 1.0L EcoBoost are simply not drivable, as exemplified by the experiences of Plaintiffs.

**PERFORMS AT MAXIMUM EFFICIENCY.**

Experience the ingenuity of the fuel-efficient, compact and powerful 1.0L EcoBoost® engine! This lightweight, die-cast aluminum award-winner combines sophisticated EcoBoost turbocharging, direct fuel injection and twin independent variable camshaft timing (Ti-VCT) technologies to generate a broad, flat torque curve. Teamed with either a 6-speed manual or 6-speed automatic transmission with SelectShift® capability, this mighty lightweight delivers 123 horses of maximum driving fun. And provides you with an impressive combination of driveability and fuel efficiency (an EPA-estimated 40 hwy mpg with the manual transmission).[2]

It's a combination that is reaping rewards, as the 1.0L EcoBoost has been named International Engine of the Year "Best Engine Under 1.0-liter" for 6 years in a row.[3]

159.    Ford touted the same characteristics describing "[a] turbocharged wonder" with "an impressive combination of driveability and fuel efficiency" in marketing the 2018 Ford EcoSport:

**ZIP AND SIP**

A turbocharged wonder, the award-winning 1.0L EcoBoost® engine[1] has an impressive combination of driveability and fuel efficiency. It's paired with a 6-speed SelectShift® automatic transmission and front-wheel drive (FWD)[1]

**FIND YOUR SWEET SPOT**

The 2.0L Ti-VCT engine[1] combines direct injection with twin independent variable camshaft timing to deliver an impressive 166 horsepower. It's paired with intelligent 4WD[1] for enhanced driving fun.

160.    Ford repeated the same description of "an impressive combination of driveability and fuel efficiency" for the 2019 Ford EcoSport:



161.    Ford similarly describes the "turbocharged wonder" that "offers an impressive combination of driveability and fuel efficiency" for the 2020 Ford EcoSport:



162.    Ford touted the "award-winning engines" with technology allowing for seamless driving and fuel efficiency, which means "this turbocharged beauty gets you wherever you need to go" in the 2021 Ford EcoSport:



163.    Ford similarly touted the quality and fuel efficiency of the 1.0 EcoBoost engine in the 2016 Ford Fiesta:



164.    The 2017 Ford Fiesta was the last year that the 1.0L EcoBoost engine was available in the model.   By that time, Ford had limited its claims about the engine to one about fuel efficiency:

For the ultimate in Fiesta efficiency, opt for the SE EcoBoost® Fuel Economy Package. Equipped with the 1.0L EcoBoost engine,¹ Fiesta has an EPA-estimated rating of 41 hwy mpg² – along with an impressive 123 horsepower and 125 lb.-ft. of torque. Rounding out the trio is the 197-horsepower,³ high-output 1.6L EcoBoost engine in the Fiesta ST. It supplies enthusiastic performance, plus an EPA-estimated 33 hwy mpg.²

165.    At no time while advertising the benefits of the 1.0L Ford EcoBoost engine did Ford reveal one of the largest drawbacks: that the engines suffered from the Oil Pump Defect.

166.    Ford further describes the safety benefits and innovativeness of their engineering, specifically touting the driver-assistance features to enhance the safety of drivers and passengers while at the same time omitting information about the Oil Pump Defect and its associated safety risk, i.e., the sudden deceleration, stalling, and activation of limp mode, while the vehicles are being driven.

167.    For example, the below advertisement fails to mention the Defect or its risks while describing the enhanced safety features in the section touting Driver-assist features in the 2016 Ford Focus:

168.    Similarly, the below advertisement fails to mention the Defect or its risks, but provides details on smart-driver assist technologies enhancing safety in the 2017 Ford Focus:

169.    The below advertisement also details several safety features in the 2018 Ford Focus but fails to mention the Defect or its risks:

## INSPIRES DRIVING
# CONFIDENCE.

**SAFETY CAGE CONSTRUCTION**
High-strength steel makes up over half of the
2018 Focus body structure. While SPACE (Side
Protection And Cabin Enhancement) Architecture
and the Trinity front-crash structure help divert
crash forces away from occupants.

**7 STANDARD AIRBAGS**
Focus offers driver and front-passenger front
airbags, a driver's knee airbag, front-seat side
airbags, and side-curtain airbags that deploy to
cover both rows of the vehicle in certain side-
impact collisions.

**ADVANCETRAC**
To avoid skidding and fishtailing in inclement
weather, AdvanceTrac® electronic stability
control¹ automatically helps keep all 4 wheels
firmly planted.

170.    Ford similarly omits mention of the Defect and its risks, while going to great

lengths to tout five safety systems in the 2018 Ford EcoSport:

**BIG ON PROTECTION** 10 standard airbags on EcoSport include: driver and front-passenger dual-stage front; driver and front-passenger knee; front- and rear-seat side, and side-curtain airbags for both rows.

**STAY ALERT TO TRAFFIC** BLIS® (Blind Spot Information System) with cross-traffic alert[1,2] helps warn you if it detects a vehicle in either of your blind spots while driving forward, or approaching from the sides while in Reverse.

**ACTIVATE WHEN WET** When the rains come, rain-sensing windshield wipers[1] turn on automatically to help keep your forward view clear.

**BE ALERTED TO WHAT'S BEHIND YOU** Along with the standard rear view camera, the Reverse Sensing System[1] audibly alerts you to objects behind EcoSport as you slowly back up.

**MAINTAIN YOUR BALANCE** Smart standard features like AdvanceTrac® with RSC® (Roll Stability Control™)[3] provide enhanced stability in a variety of conditions. By selectively applying individual brakes and modifying engine power, the system helps keep all 4 wheels firmly planted.

171. The 2017 Ford Fiesta was advertised by Ford as "Big on Safety" but failed to mention that the Oil Pump Defect could cause the vehicle to stop suddenly while in motion:

BIG ON SAFETY.

Underneath the aerodynamic shape of the 2017 Fiesta, there are many protective layers. Strength surrounds you in the form of a rigid safety cage. High-strength and ultra-high-strength boron steel work with SPACE (Side Protection And Cabin Enhancement) Architecture to help divert crash forces from occupants. Next, 7 standard airbags include: driver and front-passenger front; driver's knee; front-seat side, and side curtains.

Underpinning it all, AdvanceTrac® electronic stability control automatically helps avoid skidding and fishtailing, helping keep all 4 wheels firmly planted!

172.    Ford provides several warranties when consumers purchase Ford-branded vehicles, including a "Bumper to Bumper," 3-year or 36,000-mile warranty, and a Powertrain, 5-year or 60,000-mile warranty.  Both of these warranties are part of the New Vehicle Limited Warranty ("NVLW").  These warranties are transferrable to subsequent owners, within the stated durational or mileage limits of the warranties.

173.    The engine, including "all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, **oil pump**, seals and gaskets, engine thermostat, engine thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" is covered by both the "Bumper to Bumper" and the Powertrain warranty (emphasis added).

174.    The NVLW provided by Ford promises that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period."  Ford also limited the remedy under the NVLW "to repair, replacement, or adjustment of defective parts" and states that "[t]his exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner."

175.    If Ford and/or its dealerships deem that vehicle has been presented within the time and mileage limitations of the warranty drafted by Ford, replacement of the oil pump or any component damaged by the Oil Pump Defect will be covered under the warranty for manufacturing and workmanship defects.

**I.    The Oil Pump Defect**

176.    Since at least 2011, Ford has been manufacturing and selling vehicles with the same or substantially similar EcoBoost 1.0L engines as those in the Class Vehicles.  The Class Vehicles

themselves have identical EcoBoost 1.0L engines that do not differ materially from the EcoBoost 1.0L engines installed in previous model years of the same vehicles.  Moreover, the oil pump used in these engines are the same or substantially similar.

177.    As with all internal combustion engines, the purpose of engine oil is to provide lubrication in order to reduce friction and wear on moving parts of a vehicle's engine.

178.    If there is insufficient oil or oil pressure, the engine will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance (i.e. loss of power), and/or catastrophic engine failure when damaged moving parts cease to be able to move.  Insufficient oil can also result in engine stalling or seizing while the vehicle is in use.

179.    The oil pump is the central component of the lubrication system. The oil pump is responsible for transferring oil from the oil pan and pumping it through the engine and eventually back to the sump for recirculation. In order to do this sufficiently lubricate and cool the engine, engine oil must be maintained at a certain pressure level.

180.    The oil pump is a critical component of the engine. Oil pump failure causes complete engine failure.

181.    Oil pumps in automobiles are either belt-driven or chain-driven. This refers to the mechanism used to control and time the circulation of the engine oil. Chains are made of metal, while belts are typically made of rubber.

182.    Belt-driven systems utilize belt tensioners to keep the belt at the correct tension level. If the belt is too tight or too loose, it can cause premature wear on the belt.  Premature wear on the belt can cause the oil pressure to drop and eventually for the belt to stop pushing the oil back into the system.  Moreover, the wear on the belt can cause pieces of the belt to break off and begin to circulate in the oil, damaging other engine components and leading to a loss of motive power.

183.    Traditionally, belt-driven systems utilize a dry belt in which the system is designed in such a way that the belt does not touch the oil. This is because oil can degrade the rubber over time.

184.    Recently, however, in a quest to make engines smaller, quieter, and more fuel efficient, some automakers have begun using wet belt or belt-in-oil designs. In this type of design, the belt actually sits inside the oil sump and is in direct contact with the engine oil. This new belt-in-oil design is made possible because of belts made from improved materials, i.e. materials which can withstand the heat, pressure, and friction of a moving engine.

185.    Ford was among the earliest adopters of this belt-in-oil design, utilizing it in the 1.0L EcoBoost engines in Class Vehicles.

186.    Discovery will show that the oil pumps in 1.0L EcoBoost engines suffer from design, manufacturing and/or workmanship defects which cause the oil pump belt to disintegrate or wear, leading to a loss of oil pressure, introduction of debris from the belt beginning to circulate the engine oil, and loss of lubrication, causing the moving metal pieces in the engine to come into contact with one another and cause damage such that metal shavings and pieces circulate throughout the engine.  This Oil Pump Defect is the result of: 1) defective oil pump belt tensioners which do not hold the belt at the sufficient tension for the belt to operate properly; and/or 2) the use of an improper material in the belt (whether by design or by the installation of a belt which has not been made properly according to the specifications of Ford's design).   As a result of the Oil Pump Defect, a large number of drivers report loss of oil pressure and oil pump failures in their Class Vehicles, including Plaintiffs, and are forced to purchase new oil pumps and/or engines.

187.    The Defect is inherent in all Class Vehicles.  The Defect manifests first in a loss of oil pressure, often at levels too low for the oil pressure sensor to register.  As the Defect worsens, the oil pressure continues to drop until it triggers the oil pressure sensor.  Once the sensor is triggered, the computer which runs the engine, called an "Engine Control Unit" or "Engine Control Module" ("ECM"), evaluates the information from the sensor and sets a "Diagnostic Trouble Code" ("DTC").  The DTCs are codes set by the computer so that it can communicate what exactly

is wrong with a vehicle to a mechanic.  As the name implies, DTCs are used for diagnosis.  The manufacturer, in this case Ford, decides how and when the ECM sets a DTC, *i.e.* when a condition is serious enough to alert the mechanic.  Some DTCs are set without making themselves apparent to the driver and can only be read by a mechanic with access to a computer which can read the DTCs from the ECM, *i.e.* a dealership technician.  Other DTCs, including the DTC associated with low oil pressure, are chosen by the manufacture to automatically trigger a light on the dashboard to communicate critical information to the driver.  In this case, Ford has chosen the DTC associated with low oil pressure to set only when engine failure is imminent.  When this DTC sets, a light illuminates on the dashboard alerting the driver to the engine condition.  Once the light illuminates, the oil pressure in the engine is so low that the vehicle can become difficult to operate, particularly at higher speeds.

188.    The Defect manifests immediately in the engines, but only becomes apparent to a driver after significant time has passed in part because Ford has deliberately set the oil pressure sensor to warn about a low oil pressure when catastrophic failure is imminent.  Similarly, the other symptoms of the Defect which would alert a driver, including noise from the failing oil pump, knocking noises from engine as metal components hit each other without sufficient lubrication, loss of power, stalling, smoke coming from the engine and/or fires, all occur when engine failure is imminent, and the engine is already beyond repair. Moreover, these symptoms cause unsafe conditions, including the sudden loss of forward propulsion or stalling and present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.

189.    The Defect also results in costly engine replacements. Moreover, Ford specifically drafted the Powertrain warranty for the Class Vehicles knowing that consumers are unlikely to discover the Defect until after the 60,000 miles threshold.  As such, Ford is improperly shifting the cost of the Defect onto unsuspecting consumers like Plaintiffs and Class Members, which can cost around $6,000-$10,000 for engine replacement.

190.    Owners and lessees further incur considerable out of pocket expense in the form of rental cars, alternate transportation, and towing/roadside assistance when their Class Vehicles break down. Moreover, because a large number of Class Vehicles with the 1.0L EcoBoost engine have suffered from catastrophic engine failure as a result of the Defect, there is a shortage of available engines to be installed as replacements.  As such, Class Members including Plaintiffs often have to wait weeks or months for replacement engine.

191.    Furthermore, the replacement engines are also subject to the Oil Pump Defect and, Plaintiffs and Class Members who received new engines continue to have vehicles subject to the Defect, which currently are being damaged due to the Defect, and can expect to suffer engine failure again in the future.

192.    Ford, through its authorized dealerships and service centers, has failed to remedy the Defect.  Until the Defect is fixed by Ford, owners and lessees of Class Vehicles will continue to be at risk of dangerous engine stalling, extensive engine damage, costly engine replacements and the expense and inconvenience of frequent dealership visits. The engine in each of the Class Vehicles is the same 1.0L EcoBoost Engine, and is the same engine as used in previous model years, and critically, have the same oil pumps.  Moreover, despite extensive knowledge of the Oil Pump Defect from prior model years, Ford made no changes to the oil pump before manufacturing and marketing the Class Vehicles.  Indeed, the Defect was inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

193.    Ford knew about the Defect present in every Class Vehicle, along with the attendant safety problems, and concealed this information from Plaintiffs and Class Members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the Class Vehicles, Ford has insisted that the vehicles are working as designed.

194.    If Plaintiffs and Class Members had known about the Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

195.    As a result of their reliance on Ford's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles are defective, that they overpaid for defective vehicles, and that the Class Vehicles' engines and their use of a defective oil pump increase Class Members' chances of being involved in a collision by overheating, catching fire or catastrophically failing.

## II.    Ford Had Superior and Exclusive Knowledge of the Oil Pump Defect

196.    Ford became aware of the Defect at least as early as 2011, well before Plaintiffs and Class Members purchased their Class Vehicles. Ford learned of the Defect through sources such as pre-release evaluation and testing including thermal testing; repair data; replacement part sales data; early consumer complaints made to Ford and/or NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

197.    While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the 1.0L EcoBoost engines and the oil pumps installed in those Vehicles. Adequate pre-release analysis of the design, engineering, and manufacture of the 1.0L EcoBoost engine in the Class Vehicles would have revealed to Ford that the design and/or manufacture of the oil pump was defective and susceptible to failure as outlined above.

198.    Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components, including the engines, to verify the parts are free from defect and align with Ford's specifications.[3] This is especially true of vehicles and engines which feature newly designed or

---

[3] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited June 6, 2022).

redesigned components, such as the new oil pump with the belt-in-oil design.  Ford would have had to test this component extensively to ensure that it meet industry standards for durability.

199.    Indeed, Ford worked with FEV, Inc. in developing the 1.0L EcoBoost engine. According to FEV, they "provided support in the area of design and [computer aided design], combustion development, and engine build for 36 engines."  Those engines would have been tested extensively to ensure proper operation and necessarily revealed the limitations of the oil pump integrated into the 1.0L EcoBoost engine.[4]

200.    Ford touts its extensive pre-production testing, both in the United States at its Michigan and Arizona Proving Grounds, and at testing centers throughout the world, including in the United Arab Emirates, Thailand, China, Australia, and India.  Indeed, pre-production thermal testing of vehicles with Ford Total Durability Cycle necessarily revealed the Oil Pump Defect and its associated safety risk.  Despite this, Ford manufactured hundreds of thousands of vehicles with this defective oil pump in the 1.0L EcoBoost engine, including the Class Vehicles.

### A.    Complaints Reported to NHTSA

201.     Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

202.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related, such as spontaneous engine fires.

---

[4]     https://www.fev.com/en/media-center/press/press-releases/news-article/article/fev-inc-displays-ford-10l-ecoboost-engine-at-sae-world-congress.html

203.    Many Class Vehicle owners and lessees submitted complaints about the Transmission Defect with NHTSA's Office of Defect Investigations ("ODI").

204.    From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Transmission Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Defect is widespread in Class Vehicles, and a safety hazard.

205.    The following complaints are a sampling of the scores of available complaints through NHTSA's website, www.safercar.gov, which reveal that Ford, through its network of dealers and repair technicians, was made aware of many oil pump failures in Class Vehicles.[5]:

206.    The following customer complaints were posted on NHTSA's website regarding the 2018 Ford EcoSport:[6]

- Posted on 8/16/22
  - "The contact owns a 2018 Ford Ecosport. The contact stated while driving 75 MPH, the message "Low Engine Oil Pressure" was displayed. The contact veered to the side of the road. The contact turned off and restarted the vehicle; however, the failure persisted. The contact was able to continue driving at 20 MPH. The vehicle was taken to an independent mechanic where it was diagnosed that the timing belt had failed and damaged the engine. The independent mechanic diagnosed that the engine needed to be replaced. The manufacturer was notified of the failure and referred the contact to the dealer. The dealer informed the contact that the VIN was not under recall. The vehicle was not repaired. The failure mileage was approximately 69,000."
- Posted on 8/7/22
  - "The contact owns a 2018 Ford Ecosport. The contact stated that while driving at 50 MPH, the low engine oil pressure warning message appeared on the instrument panel. The contact managed to pull over and replenished the engine with oil; however, soon after start-up, an abnormal, knocking noise began to emit from the engine as black smoke also emitted from the engine. The vehicle began to lose power as the contact pulled over and shut off the engine. The contact had the vehicle towed to a dealer where it remained in their possession. The vehicle had yet to be

---

[5] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

[6] https://www.nhtsa.gov/vehicle/2018/FORD/ECOSPORT/SUV/FWD

repaired. The manufacturer for notified of the failure. The failure mileage was 58,198."

- Posted on 7/15/22:
  - I was pulling on to the highway and out the clear random, my oil pressure light came on and I heard a clunk. I pulled over and started it back up and the light still came on. I was going to attempt to drive the 3 miles home and the car gave out. No one can find any reason my vehicle did this. The oil was changed 4 days prior and all of the oil was applied and properly placed. I am looking into legal action. We may have a class action lawsuit. If anyone would like to be a part, contact me, phyllis_neal@yahoo.com. This is not ok or fair. I have been fired from my job, this has negatively impacted my family and it's just inconvenient.

- Posted on 7/9/22
  - "Warning across dashboard stated engine oil pump pressure low then heard grinding noise. Towed to mechanic and found out the oil pump belt was broken and had metal in engine causing engine to fail also messing up turbo. Have to now replace engine with turbo which is costly but still owe on vehicle. Engine is $7000+ and is extremely hard to find plus was told the problem will most likely happen again. If I had been driving when this happened the motor would have locked up causing an accident and could have possibly been fatal per mechanic."

- Posted on 7/2/22
  - "While driving my 2018 ecosport, i got a warning of "low oil pressure". I thought my car was losing oil so I stopped. Checking the oil noticed that had all the oil and there was no leak. Next day took it to Pep Boys, since it was Sunday July 3rd, and told me the diagnostic (PO365 camshaft pos sensor) Ford warranty is of 60,000 miles (i have just under 88,000 on my car). They advised me to take it to my local ford dealership to have a second opinion, since they don't do that type of job. Ford dealer confirmed the same problem, and if so, I would need a new motor because they do not open this type of motor to fix it. I contacted ford customer service to bring the problem to their attention and they told me there was nothing they could do. upon further investigation I have found this is chronic problem with the 1.0 turbo ecoboost engines and found a class action lawsuit (from CSK&D-FORD ECOSPORT ECOBOOST DEFECT -CLASS ACTION INVESTIGATION) started against ford for this specific issue, and they still will not help me cover the costs. I cannot afford to replace the engine and still owe too much on the car to try to trade it in. it has caused a major hardship on my fiancé and I, trying to find a jobs since this car was my UBER only job, while prices of parts and gas are skyrocketing. I have only had this car for 3 years and under 88,000 miles and it is completely undrivable due to the faulty and carless engineering.Started driving home and noticed a significant decrease in power and the engine ceased and died. Had car towed home."

- - Posted on 6/6/22
    - Started with the oil pressure engine light coming on and off always told it's a sensor then 2 days it wasn't putting any oil to one of the rocker arms and told by a dealership that it's going to cost me$7500 for a whole new engine when all they did was their diagnostic test.
  - Posted on 2/27/22
    - The contact owns a 2018 Ford Ecosport. The contact stated that while driving at an undisclosed speed, the vehicle made abnormal sounds and then lost motive power. The low oil pressure warning light was illuminated. The vehicle was towed to the contact's residence, where an independent mechanic diagnosed the vehicle with oil pump failure. The contact was informed that the oil pump needed to be replaced; however, parts were on backorder. The vehicle was not repaired. The manufacturer was not made aware of the failure. The failure mileage was approximately 85,900.

207.    The following customer complaints were posted on NHTSA's website regarding the 2019 Ford Ecosport:[7]

- - Posted on 8/16/22
    - "I was driving my car at 35 miles and my car started accelerating and making noise and warning light illuminated and I have to emergency pullover, my 2019 EcoSport have 69,400 miles. Now the Ford dealer said is an TSB on my car and I need to call Ford Company because my extended warranty is expired. The report from dealer said that is an SSM 49918 For loss of engine oil pressure."
- ➢ Posted on7/23/22:
  - "Since I leased this car, I've had three transmission replacements, a full wiring harness replacement, numerous electrical issues with the display, and now can't drive it due to engine low oil pressure. This car is nothing but a nightmare."
- ➢ Posted on 5/4/22
  - "Oil pump belt shredded without warning at 62,000 miles causing complete engine failure while driving in traffic. Multiple warning lights illuminated, but failure was abrupt and immediate. Car was performing normally and then within a matter of seconds I experienced complete loss of power. Vehicle is presently at the Ford garage. Ford representative told us that the belt for the oil pump shredded and caused loss of oil pressure which lead to a complete loss of power."
- ➢ Posted on 4/9/22
  - The contact owns a 2019 Ford Ecosport. The contact stated that while driving at an undisclosed speed, the brakes seized and the vehicle lost motive power. The check engine, battery, and ABS warning lights were illuminated. The contact replaced the battery; however, the failure recurred. The vehicle was not diagnosed nor repaired by an independent mechanic or dealer. The manufacturer was made aware of the failure

---

[7] https://www.nhtsa.gov/vehicle/2019/FORD/ECOSPORT/SUV/FWD

and advised the contact to file a complaint with NHTSA. The failure mileage was approximately 55,000."

➢ Posted on 1/8/20

▪ I WAS A STOP LIGHT AND THE VEHICLE SUDDENLY SHUT OFF AND WOULD NOT LET ME RESTART IT. AFTER AWHILE AND A FEW WARNING SYSTEMS THE VEHICLE FINALLY TURNED OVER. AFTER THAT THE ENGINE LIGHT CAME ON AND THE VEHICLE STARTED TO RUN A DIAGNOSTICS WHICH I WAS UNABLE TO SEE. AS I BEGIN TO DRIVE AGAIN THE VEHICLE STABILITY CONTROL CUTS OFF AND CAUSES ME TO TEMPORARILY LOSE CONTROL OF THE VEHICLE. AS I'M REGAINING CONTROL OF THE VEHICLE THE TRACTION CONTROL TAKES OVER AGAIN AND HELPS ME OUT. I'M NOT SURE AS TO WHAT HAPPENED TO MY VEHICLE STILL WAITING FOR THE DEALER TO GET BACK TO ME. BUT WHATEVER IT WAS IT WASN'T SAFE AND PUT ME IN A DANGEROUS SPOT DURING RUSH HOUR TRAFFIC

208.   The following customer complaints were posted on NHTSA's website regarding the 2020 Ford EcoSport:[8]

▪ **Posted 4/25/23**

• While driving my 2020 Ford Ecosport it spontaneously caught fire and exploded on Sunday, May 29th. •I purchased my 2020 Ford Ecosport from Ford or Helfman Ford in Stafford Texas on Monday, May 25th, 2020. I immediately had problems with the vehicle and have taken the vehicle in multiple times for overheating issues and the check engine light coming on. •May 25th, 2020 – overheating and coolant light came on. Vehicle taken to Planet Ford in Dallas May 28, 2020. Vehicle repaired and picked up from Planet Ford on May 29th, 2020. •May 30th, 2020 - check engine light came back on. Vehicle taken back to Planet Ford in Dallas June 2, 2020 and I picked it up. Vehicle repaired and picked and I picked June 5, 2020. •April 2nd, 2021, I took it the vehicle to Helfman Ford for routine maintenance and the continuous check engine light problem. I received the car back the same day with paperwork stating that they could not re-create the problem. •August 4th 2021, I took it back to Helfman Ford, vehicle was running very rough and was extremely loud. On 10/06/2020 the vehicle was returned after extensive repairs were done to exhaust and engine under warranty (see repair invoice). •My check engine light and coolant light continued to come on sporadically producing the same error messages in the Ford app for my car. •On May 7, 2022 My check engine light come back on and I received an error message that I had never seen prior but as soon as I

---

[8] https://www.nhtsa.gov/vehicle/2020/FORD/ECOSPORT/SUV/FWD

stopped the message went away •On May 17, 2022 I took the car in one final time too Planet Ford Dallas. They replaced the coolant sensor but were not able to replicate the error and I was told since they could not produce the error, •On May 29, 2022 at 2:08 while driving the check engine came on, and I lost all engine power. Smoke started coming from the engine area and within seconds from exiting the vehicle the engine was on fire and the car exploded.

- Posted March 8, 2023
  - Was leaving work and suddenly the oil pressure light came on and the engine started making a terrible noise. I pulled over and had the car towed to the Ford dealership. The dealership inspected it and said that the oil pump belt "shredded" and the sudden loss of oil pressure, along with the debris from the oil pump belt, completely ruined both the motor and the turbo requiring full replacement of both at a cost of $6500. Car was purchased new less than 2 1/2 years before but Ford will not pay for the repairs.

- 12/13/2022
  - Driving on the interstate the low oil pressure light came on no check engine lights or anything . The oil pump is belt driven aka wet belt and the rubber teeth come off stopping up the oil pump and causing it not to work properly . With the rubber pieces going into the motor the rubber melts causing issues with the pistons and engine block. The Ford dealership recommends not replacing just the oil pump because of all the other issues the rubber belt causes because it melts inside the engine . So I am left with no choice but to replace the engine at a cost of 5,000.00. Why there hasn't been a recall is questionable . I am in the process of getting said motor replaced but does that mean every 2 years it will have same issues ?

209.    The following customer complaints were posted on NHTSA's website regarding the 2021 Ford EcoSport:[9]

- Posted 2/27/2023
  - The contact owns a 2021 Ford EcoSport. The contact stated that while driving at 55 MPH, the low-pressure oil message appeared on the instrument panel.  The contact pulled the vehicle off to the shoulder of the highway and had the vehicle towed to the dealer.  Once at the dealer, a diagnostic test was performed and showed that the oil pump and the oil pump belt had malfunctioned, which resulted in engine damage.  The manufacturer was notified of the failure. The vehicle was not repaired.  The failure mileage was approximately 60,539.

---

[9] https://www.nhtsa.gov/vehicle/2021/FORD/ECOSPORT/SUV/FWD

210.    The following customer complaints were posted on NHTSA's website regarding the 2016 Ford Focus:[10]

- **10/4/2017**
  - Driving on the interstate the low oil pressure light came on no check engine lights or anything . The oil pump is belt driven aka wet belt and the rubber teeth come off stopping up the oil pump and causing it not to work properly . With the rubber pieces going into the motor the rubber melts causing issues with the pistons and engine block. The Ford dealership recommends not replacing just the oil pump because of all the other issues the rubber belt causes because it melts inside the engine . So I am left with no choice but to replace the engine at a cost of 5,000.00 . Why there hasn't been a recall is questionable . I am in the process of getting said motor replaced but does that mean every 2 years it will have same issues ?

- 4/24/2017
  - TL* THE CONTACT OWNS A 2016 FORD FOCUS. THE CONTACT STATED THAT THE VEHICLE EXPERIENCED A COMPLETE LOSS OF POWER AND WOULD NOT ACCELERATE WHEN THE ACCELERATOR PEDAL WAS DEPRESSED. ALSO, THE OVERHEATING WARNING INDICATOR ILLUMINATED AND THE VEHICLE ENTERED INTO "LIMP HOME" MODE, WHICH ALLOWED THE USE OF THE VEHICLE BUT NOT OVER 5 MPH. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE VEHICLE EXPERIENCED MULTIPLE ENGINE FAILURES AND THE ENGINE WOULD NEED TO BE REPLACED. THE VEHICLE WAS REPAIRED, BUT THE TRANSMISSION WARNING INDICATOR ILLUMINATED AND THE VEHICLE STILL EXPERIENCED HESITATION. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS 14,000. UPDATED 08/29/17*LJ *CN

- 4/11/2019
  - TL* THE CONTACT OWNS A 2016 FORD FOCUS. THE CONTACT TOOK THE VEHICLE TO SAM GALLOWAY FORD LINCOLN (1800 BOY SCOUT DR, FORT MYERS, FL 33907, (888) 699-0916) DUE TO ENGINE FAILURE. THE DEALER REFUSED TO REPAIR THE VEHICLE BECAUSE IT WAS NINE MILES OVER THE WARRANTY COVERAGE MILEAGE LIMIT. THE DEALER SUGGESTED A COMPLETE REPLACEMENT OF THE ENGINE AT THE CONTACT'S EXPENSE. THE MANUFACTURER WAS NOT CONTACTED. AN INDEPENDENT MECHANIC REPLACED THE ENGINE, WHICH ONLY LASTED ONE WEEK. THE MECHANIC

---

[10] https://www.nhtsa.gov/vehicle/2016/FORD/FOCUS%252520RS/5%252520HB/AWD

REPLACED THE ENGINE WITH ANOTHER ONE, WHICH LASTED SEVERAL MONTHS BEFORE FAILING AGAIN. THE CONTACT STATED THAT THE VEHICLE WAS CURRENTLY STRANDED IN ANOTHER STATE. THE FAILURE MILEAGE WAS UNKNOWN.

- 10/24/2019
  - AT HIGHWAY SPEED, VEHICLE WENT INTO LIMP MODE RESTRICTING THROTTLE RESPONSE WITH NO DASH INDICATORS. UNABLE TO ACCELERATE. NO CHECK ENGINE LIGHT, NO MESSAGES, ALL GAUGES IN NORMAL RANGE. UNSAFE CONDITION WHEN VEHICLE RESPONDS VERY SLOWLY WITH NO INDICATOR FOR DRIVER. VEHICLE IS THE 1.0 L ECOBOOST WITH 6MT TRANSMISSION.
- 10/12/2019
  - AT HIGHWAY SPEED, VEHICLE WENT INTO LIMP MODE RESTRICTING THROTTLE RESPONSE WITH NO DASH INDICATORS. UNABLE TO ACCELERATE. NO CHECK ENGINE LIGHT, NO MESSAGES, ALL GAUGES IN NORMAL RANGE. UNSAFE CONDITION WHEN VEHICLE RESPONDS VERY SLOWLY WITH NO INDICATOR FOR DRIVER. VEHICLE IS THE 1.0 L ECOBOOST WITH 6MT TRANSMISSION.
- 8/13/2020
  - MY ENGINE HAD RUBBER PIECES IN IT FROM THE BELT INSIDE THE ENGINE EXPLODING - I HAVE AN EXTENDED WARRANTY AND FORD WILL NOT COVER IT DUE TO THE TENSIONER BELT BROKE TOO WHICH IS NOT A COVERED PART
- 7/29/2020
  - ENGINE TROUBLE AT 62,000 MILES - METAL SHAVINGS IN THE OIL
- 10/28/2020
  - WAS DRIVING DOWN THE INTERSTATE AT ROUGHLY 80 MILES PER HOUR WHEN THE CHECK ENGINE LIGHT CAME ON. ENGINE LOST POWER AND WOULD NOT ACCELERATE. ENGINE STARTED MAKING A LOUD NOISE. CAR WILL STILL START BUT IS NOT DRIVABLE AND ENGINE HAS NO OIL PRESSURE AND MECHANIC SAID IT DOWNSHIFTED TO 4TH GEAR AT 83 MPH. CAR HAS BEEN SERVICED REGULARLY AND HAS GIVEN NO INDICATION OF ENGINE PROBLEMS. WAS QUOTED $4500 AT FIRST FORD DEALERSHIP TO REPAIR CAR WITH A USED MOTOR WITH EQUAL MILEAGE. 2ND FORD DEALERSHIP QUOTED $3700 WITH REBUILT MOTOR. HAS BEEN LOOKED OVER BY 2 MECHANICS INCLUDING FORDS AND OTHER THAN READING DIAGNOSTICS NOBODY CAN PROVIDE A REASON THE OIL PRESSURE DROPPED OR WHY THE CAR DOWNSHIFTED INTO 4TH GEAR UPING THE RPM'S CAUSING ENGINE PROBLEMS. THEY SAID THERE IS NO OTHER PROBLEMS WITH THE CAR AT THIS POINT OTHER THAN THE ENGINE. VERY NO SMART TO REPLACE AN

ENGINE WITHOUT KNOWING THE WHAT CAUSED THE INITIAL ONE TO FAIL.

211.    The following customer complaints were posted on NHTSA's website regarding the 2017 Ford Focus:[11]

- Posted on 6/20/2019
  - I WAS DRIVING ON THE FREEWAY JUST GETTING OFF ONTO THE OFF RAMP WHEN THE ENGINE LIGHT, OIL LIGHT AND WARNING MESSAGE CAME ON. THE ENGINE LOST COMPRESSION INSTANTLY AND REDUCED SPEED DOWN TO 30 MPH.
- Posted 7/11/2020
  - WHILE COMING DOWN A HILL MY VEHICLE'S ENGINE BEGAN TO BIG DOWN AS IF TO STALL. MY ENGINE OIL LIGHT CAME ON, I PULLED INTO A LOCAL OIL SERVICE STATION TO HAVE THEM CHECK THE OIL, (PREVIOUS SERVICE WAS APPROXIMATELY 1 MONTH PRIOR AND IT HAD ONLY BEEN APPROXIMATELY 1200 MILES SINCE LAST SERVICE). THEY SAID THAT THE OIL WAS FINE BUT I HAD THEM CHANGE THE OIL AGAIN JUST TO BE SURE. THE OIL LIGHT REFUSED TO GO OUT. I THEN HAD THE VEHICLE TOWED TO THE CLOSEST FORD DEALERSHIP BECAUSE THE VEHICLE BECAME UNSAFE AND COULD NOT BE DRIVE ACCORDING TO THE SERVICE STATION. AFTER A WEEK AT THE FORD DEALERSHIP IT WAS DETERMINED THAT THE ENGINE WAS NO LONGER HOLDING OIL PRESSURE AND THAT VARIOUS COMPONENTS INSIDE THE ENGINE HAD NOW STARTED THROWING THE CHECK ENGINE LIGHT. THE DEALERSHIP INFORMANT ME IT WOULD BE APPROXIMATELY $7700 TO REPLACE THE ENGINE, AS THE VEHICLE'S ENGINE IS IN A STATE OF FAILURE. THE VEHICLE HAS BEEN TOWED FROM THE DEALERSHIP AND SITTING IN MY DRIVEWAY AT 71457 MILES... THE DEALERSHIP SAYS THAT BECAUSE THE VEHICLE IS 11450 MILES OUT OF WARRANTY THAT THERE IS NOTHING THEY CAN DO. VEHICLE WAS REGULARLY SERVICED. I HAVE READ VARIOUS OTHER COMPLAINTS ABOUT THIS YEAR MAKE AND MODEL HAVING THE SAME ISSUE WHICH HAS LEAD TO THE VEHICLES BECOMING UNSAFE TO DRIVE AND ULTIMATELY UNABLE TO BE DRIVEN.
- **Posted 6/26/2020**
  - I WAS COMING OFF FREEWAY AND GETTING ONTO ANOTHER FREEWAY WHEN, AS I WAS SPEEDING UP TO MERGE, MY CAR BOGGED DOWN AS IF RUNNING OUT OF GAS. I LOOKED AT THE

---

[11] https://www.nhtsa.gov/vehicle/2017/FORD/FOCUS/5%252520HB/FWD

DASH AND SAW MY OIL LIGHT HAD COME ON. SO I PULLED OVER TO AN EXIT WITHIN 30 YDS. AND PULLED ONTO A STREET ABOUT ANOTHER 30 YDS. AWAY. I SHUT OFF THE CAR AND LET IT SIT A FEW MINUTES THEN CHECKED OIL. WHEN I DID, THE OIL SHOWED FULL. I THEN CALLED THE FORD DEALER I TAKE MY CAR TO FOR OIL CHANGES AND SPOKE WITH A SERVICE GUY AND TOLD HIM WHAT HAPPENED. HE WAS PUZZLED AND ASKED A FEW QUESTIONS AND THEN WE TRIED TO RESET THE OIL LIGHT. AFTER DOING THE RESET THE OIL LIGHT CAME BACK ON. I TRIED STARTING THE CAR AND IT STARTED FINE. NO ABNORMAL SOUNDS COMING FROM THE ENGINE AND IT IDLED FINE. I DECIDED TO TRY THE FREEWAY AGAIN TO SEE IF THE OIL LIGHT WAS A FLUKE. THE NEXT EXIT WAS ONLY A HALF MILE AWAY SO I COULD EASILY GET OFF FREEWAY IF NECESSARY. AGAIN, THE FREEWAY WAS ONLY ABOUT 30 YDS AWAY SO WHEN I STARTED TO MERGE ONTO THE FREEWAY THE SAME THING HAPPENED. THE CAR ACCELERATED SLOWLY AND THEN BOGGED DOWN AND THE DASH FLASHED THE ENGINE NEEDED ATTENTION OR SOMETHING LIKE THAT. AGAIN I GOT OFF AT THE NEXT EXIT, WHICH WAS RIGHT THERE WHEN IT HAPPENED. I HAD THE CAR TOWED TO THE FORD DEALER NEAR WHERE I LIVE. SERVICE WAS CLOSED BUT SOME SALES PEOPLE WERE STILL THERE AND THEY TOLD US WHERE TO PUT THE CAR. THEY DIDN'T LOOK AT THE CAR UNTIL MONDAY AND EVEN THEN THEY DIDN'T REALLY OPEN THE CAR UP AND LOOK AT IT. THE TECHNICIAN SAID PROBABLY THE TIMING/OIL PUMP BELT BROKE OR SHREDDED AND CLOGGED UP THE OIL PUMP. TO OPEN UP THE ENGINE WOULD COST $800 TO FIND OUT THE ACTUAL PROBLEM AND IF THE TECH WAS RIGHT THE ENGINE WOULD HAVE TO BE REPLACED COSTING $7400. ALL THIS BECAUSE OF A FAULTY BELT DESIGNED TO LAST 125,000-150,000 MILES. LUCKILY I WASN'T DRIVING 65MPH IN THE MIDDLE OF THE FREEWAY AND BREAKING DOWN AND GETTING SLAMMED. *TR

- **Posted 6/24/2020**
  - TL* THE CONTACT OWNS A 2017 FORD FOCUS. THE CONTACT STATED THAT WHILE DRIVING AT 45 MPH, THE OIL LEVEL WARNING LIGHT FLASHED ON THE INSTRUMENT PANEL. THE CONTACT PULLED THE VEHICLE OVER AND INSPECTED THE VEHICLE BUT FOUND NO ISSUES WITH THE VEHICLE. THE CONTACT CALLED PERRY FORD OF POWAY (12740 POWAY RD, POWAY, CA 92064, (858) 748-1400) AND SPOKE WITH A REPRESENTATIVE WHO ATTEMPTED

TO ASSIST WITH THE WARNING LIGHT FAILURE. THE CONTACT WAS UNABLE TO RESET THE WARNING LIGHT AND ATTEMPTED TO RESUME NORMAL DRIVING HOWEVER, THE FAILURE RECURRED. THE VEHICLE WAS TOWED TO THE SAME DEALER BUT WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND THE CONTACT WAS INFORMED THAT THE VEHICLE WAS OUT OF WARRANTY. NO FURTHER ASSISTANCE WAS PROVIDED. THE FAILURE MILEAGE WAS 68,000.*DT MECHANIC TOLD THE CONSUMER THERE WERE ISSSUES WITH TIMING/OIL PUMP BELT (LOCATED INSIDE THE ENGINE) BROKE/SHRED. OIL PRESSURE DROPPED AND PIECES OF BELT CLOGGED OIL PUMP AND ALSO CIRCULATED THROUGH THE ENGINE. ENGINE NEEDS REPLACEMENT. ESTIMATED COST: $7100. *JB

- 11/2/2020
  - ENGINE LOCKED UP WHILE DRIVING AND SHUT DOWN

### B.  Customer Complaints on Online Forums

212.  Consumers similarly complained about the Defect in Class Vehicles on various online forums.  Consumers have also posted extensively on websites dedicated to discussion of Ford vehicles, regarding the Oil Pump Defect in vehicles equipped with the 1.0L EcoBoost engine. In fact, Ford has made the monitoring of consumer complaints as posted on third-party websites a part of its corporate strategy for brand managed since at least 2012.[12]

213.  The following complaints are a sampling of the many complaints on third-party consumer websites, which Ford would have seen as part of its online brand management:

214.  For example, the following customer complaints were posted on Twitter regarding the Ford EcoSport

- Posted on 9/28/22
  - "@Ford We have a **2018 Ford EcoSport** and it needs a new engine block and turbo. This is the diagnosis by the Ford Dealership mechanic.  Our car has been in the

---

[12] Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it. (last visited June 17, 2022)

dealership for 3 weeks!  We are into our 3rd week of car rental and have not received any help from Ford CS.    HELP!"[13]"

- Posted on 4/2/22
  - "@Ford This company is disgraceful and treats customers downright dirty. Purchased a new ford Ecosport in 2019, engine blew up because of A DEFECT KNOWN By FORD!! Purchased from a certified dealer that won't even make an offer to purchase it back because they know it's a lemon."[14]

215.    The following customer complaint was posted on Twitter regarding the 2017 Ford Focus:

- Posted by @cmoTejada, on 6/30/18[15]
  - "Been having such a hard @Ford customer service. Our brand new 2017 Ford Focus' engine died only 13 months of us having it and barely 10k in the odo. We've called our case handler 10 times and still no answer! Just left in the dark."

216.    The following customer complaint was posted on Ford Owner's Club regarding the 2019 Ford Focus:

- Posted by John@Ford, on 6/14/19[16]
  "I just bought (a week ago) the new Ford Focus with 1.5 ecoboost engine, 150 hp. After one week of driving, I got the error ENGINE oil PRESSURE LOW. I drove the vehicle to the service and now I am waiting for the replacement of the engine."

217.    Additionally, Ford should have learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to Ford, as those reported by Plaintiffs. Ford's customer relations and technical service departments collect and analyze field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.  Discovery will also show that Ford received tens of thousands of complaints about the 1.0L Engine, including about coolant issues, fuel pump issues, as well as the oil pump issues.  The testing Ford would have done in response to these many complaints would have also confirmed the Oil Pump Defect.

---

[13] https://twitter.com/KenShannon16/status/1575267282577653760 (last visited Nov. 3, 2022).
[14] https://twitter.com/jakethejackrat/status/1510375772191608838 (last visited Nov. 3, 2022).
[15] https://twitter.com/CmoTejada/status/1013104477283504132 (last visited Apr. 26, 2023).
[16] https://www.fordownersclub.com/forums/topic/108790-engine-oil-pressure-low/ (last visited Apr. 26, 2023).

218.    Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide Ford with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to Ford, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

219.    Ford service centers, independent repair shops, and consumers doing repairs themselves use Ford replacement parts that they order directly from Ford. Thus, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders, information which is also exclusively within Ford's control and unavailable to Plaintiffs without discovery. The ongoing high sales of replacement engine and engine components such as clutches and seals, was certainly known to Ford, and should have alerted Ford that its 1.0L EcoBoost engines were suffering from an oil pump defect, causing engine failure, loss of engine power, and stalling.

220.    The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

221.    Irrespective of all the aggregate information, both internal and external, that clearly provided Ford with knowledge that the oil pump is dangerously defective, Ford has never disclosed to owners or prospective purchasers that there is a safety defect in the Class Vehicles. In fact, Ford intentionally and actively concealed the existence of a safety defect in the Class Vehicles.

222.    Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's engine is safe, will function in a manner that will not pose a safety hazard, and is free from material defects which affect the engine's ability to deliver motive power. Plaintiffs and Class Members further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as the

Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to fail to disclose the Defect to them and to continually deny the defect existed.

**C.   Technical Service Bulletins and Other Ford Communications**

223.    Beginning in 2019, Ford began issuing multiple TSBs to address the defects in their in the oil pump in 1.0 EcoBoost Engines. However, Ford never communicated the TSBs, or the information they contained, directly to the Class or any prospective buyers.

224.    Ford issued several Technical Service Bulletins ("TSBs") or Special Service Messages ("SSM") to its dealers in the United States acknowledging defects in the oil in EcoBoost 1.0L engines — the same or substantially similar engine as that equipped in the Class Vehicles. On July 22, 2019, Ford issued manufacturer communication SSM 48093. This communication warns that 2018-2019 Ford EcoSport vehicles with the 1.0 EcoBoost engine "may exhibit a loss of engine oil pressure with an illuminated oil pressure warning lamp. This may be due to a broken/failed engine oil pump belt tensioner which leads to a loss of engine oil pressure. Due to the nature of this failure, an engine replacement may be required." The communication further stated the issue was confined to vehicles built before April 3, 2019. Ford then reissued this on September 23, 2020 in another communication to dealers, SSM 49200.

225.    On April 8, 2021, Ford issued SSM 49726. This bulletin expanded the vehicles affected by the oil pump defect to some 2016-2018 Ford Focus and 2018-2019 Ford EcoSports with the 1.0L EcoBoost engine built before July 3, 2019. Ford described the vehicles "may exhibit an illuminated oil pressure warning lamp with a loss of engine oil pressure. This may be due to a failed engine oil pump belt tensioner which leads to a loss of engine oil pressure. If engine oil pressure at idle is below 10 psi and/or metal contamination is present in the engine oil, no further diagnostics should be performed." Ford directed dealerships to "[r]eplace the engine assembly to correct this condition."

226.    Ford re-issued this bulletin on June 2, 2021, adding instructions that dealerships should refer Section 303-00 in the Workshop Manual for the appropriate oil pressure test

procedure.  Ford also now specified that dealerships should "[r]eplace the engine assembly with a long block option 6006 to correct this condition."

227.    On June 30, 2021, Ford issued a new bulletin to its dealership, SSM 49918.  This time, dealerships were directed to "[r]eplace the engine assembly with a long block option 6006 and the turbocharger."

228.    Although these manufacturer communications purport to apply only to vehicles built before July 2019, consumers report identical problems in vehicles built after that date and in in subsequent model years.

229.    Notably, while these manufacturer communications show Ford has been aware of and actively studying the Defect for years, none of them suggest warning current or prospective customers, preemptively repairing Class Vehicles, or covering the cost of engine replacements.

### III.    Ford Has Actively Concealed the Oil Pump Defect

230.    Despite its knowledge of the Defect, in the Class Vehicles, Ford actively concealed the existence and nature of the defect from Plaintiffs and Class Members.  Specifically, Ford failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

    a.  any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the oil pump and the engine;

    b.  that the Class Vehicles, including their engines, were not in good working order, were defective, and were not fit for their intended purposes; and

    c.  that the Class Vehicles and their engines, specifically the oil pumps within the engines, were defective, despite the fact that Ford learned of such defects as early as 2011.

231.    As discussed above, Ford monitors its customers' discussions on online forums, and actively concealed the defect by denying the existence of a defect, and blaming the class members and a purported lack of maintenance for the problems.

232.    In particularly, despite knowing of the existence of the Defect, Ford has refused to inform potential or recent buyers that the oil pumps in their engines have a high probability of failure, usually becoming apparent to consumers after the expiration of the time and/or mileage limits of the Ford Powertrain Warranty.  If Ford had been truthful with prospective customers about the existence of the Oil Pump Defect, customers could have made choices that were in their own best interest including: 1) not purchasing the vehicle; 2) purchasing the vehicle for less; or 3) purchasing an extended warranty.  However, consumers were unable to make rational choices because Ford suppressed the information about Defect.

233.    When consumers present their Class Vehicles to an authorized Ford dealer for diagnosis and repair, Ford refuses to honor the warranty, relying on the fact that the Defect usually becomes apparent to drivers only after the expiration of the Powertrain Warranty via limits Ford decided itself were applicable.

234.    Even to the extent that Ford has acknowledged the existence of the Defect, via bulletins and direct communications with its dealerships, it did not send those communications to owners of the vehicles.  Moreover, even those communications took pains to minimize the extent of the Defect, trying to artificially limit the number of vehicles in which the Defect existed.

235.    Accordingly, despite Ford's knowledge of the Transmission Defect, Ford has caused Class Members to expend money at its dealerships to diagnose, repair, or replace the Class Vehicles' Transmissions and components, once the time limitations have run on the bumper-to-bumper warranty.

## IV.    Ford Unjustly Retained Substantial Benefits

236.    Ford unlawfully failed to disclose the Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

237.    Plaintiffs further allege that Ford thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles.

238.    Specifically, Plaintiffs purchased their vehicles and/or parts needed to attempt repairs to their vehicles from Ford authorized dealerships.  Those dealerships purchased those vehicles and/or components from Ford.

239.    As discussed above therefore, Plaintiffs allege that Ford unlawfully induced them to purchase their respective Class Vehicles and/or components for their Class Vehicles by concealing and/or omitting a material fact (the Oil Pump Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Oil Pump Defect.

240.    Moreover, because Plaintiffs are likely to need further replacements of the engines in the future, they will be forced to purchase more defective components from Defendant absent some relief which forces the Defendant to correct the defective components.

241.    Accordingly, Ford's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that did - and likely will continue to - deceive consumers, should be disgorged.

**V.    The Agency Relationship Between Ford and its Network of Authorized Dealerships**

242.    Defendant enters into agreements with its nationwide network of authorized dealerships to fulfill Defendant's obligations under the warranties it provides directly to consumers as well as to provide repairs under recalls. These agreements require a dealership to follow the rules and policies of Ford in all aspects of diagnosing, repairing, maintaining, and servicing Ford vehicles, as well as selling only Ford-approved parts for the vehicles, for reimbursement by Ford.

243.    Because Plaintiffs and members of the Class are third-party beneficiaries of the manufacturer-dealership agreements which create the implied warranty, they may avail themselves of the implied warranty and allow consumers to seek warranty and recall services locally. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor*

*Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

244.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

245.    Defendant issued the express warranties to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Moroney Stickers on Defendant-branded vehicles.

246.    In repairing Ford-branded vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

247.    The authorized Ford dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents, often only accessible via Defendant's proprietary systems and tools, including the Ford diagnostic scan tool referenced on many TSBs such as the Ford Integrated Diagnostic System and Ford J2534 Diagnostic Software;

      a.    Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

b. The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

c. Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

d. Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public;

e. Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Transmission Defect by prescribing and implementing the relevant TSBs cited herein; and

f. Ford's authorized dealerships are able to bind Ford into the terms of the express warranties by selling vehicles to the public, by reviewing the quality of used Ford vehicles and certifying their worthiness to receive Ford's Certified Pre-Owned Warranties.

248. Indeed, Ford's warranty booklets make it abundantly clear that Ford's authorized dealerships are Ford's agents so that consumers may receive repairs from Ford under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your selling dealer." For example, the booklets state, that "[w]hen you need warranty repairs, your selling dealer would like you to return to it for that service, but you may also take your vehicle to another Ford Motor Company dealership authorized for warranty repairs." The booklets further

state that "[y]our Ford or Lincoln dealership, or Ford or Lincoln Auto Care Service Center, has factory-trained technicians who can perform the required maintenance using genuine Ford parts."

249.    The booklets further state that "[d]uring the Bumper to Bumper Warranty period, dealers may receive instructions to provide no-cost, service-type improvements – not originally included in your Owner's Manual – intended to increase your overall satisfaction with your vehicle."  As such, authorized dealerships are not only Ford's agents to perform Ford's promised services under the warranties provided by Ford directly to the consumer, and are Ford's agents to provide "improvements" to Plaintiffs' and Class members' vehicles at Ford's direction.

## TOLLING OF STATUTES OF LIMITATIONS

250.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Transmission Defect and misrepresentations and omissions alleged herein.  Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.  Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

251.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Transmission Defect and the corresponding safety risk.  As alleged herein, the existence of the Transmission Defect was material to Plaintiffs and members of the Class at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

252.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Transmission Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Transmission Defect in Class Vehicles.

253.    Defendant knowingly, actively, and affirmatively concealed the facts alleged herein.  Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

254.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

255.    This action is brought and may be maintained as a class action, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rule of Civil Procedure.

256.    The Nationwide Class is defined as follows:

> **Class**: All persons in the United States who bought or leased, other than for resale, any Ford Focus or Ecosport vehicle equipped with a 1.0L EcoBoost engine model year 2016 or later ("Class Vehicles").

257.    In addition, or in the alternative, State Subclasses are defined as follows:

**California Subclass**

All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of California.

**Florida Subclass**

All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of Florida.

**Michigan Subclass**

All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of Michigan.

**Pennsylvania Subclass**

All individuals who purchased or leased, other than for resale, any Class Vehicle in the Commonwealth of Pennsylvania.

**Texas Subclass**

> All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of Texas.

258.     Excluded from the Class are Ford, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

259.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of Ford and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that at least thousands of Class Vehicles have been sold and leased nationwide and in each of the states where Plaintiffs reside. Members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by Ford in connection with its sales and leases of Class Vehicles.

260.     **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a.    whether Ford engaged in the conduct alleged herein;

    b.    whether Class Vehicles are defective;

    c.    whether Ford placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

    d.    whether Ford knew or should have known of the Defect, and if so, for how long;

    e.    when Ford became aware of the Defect in the Class Vehicles;

    f.    whether Ford knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g.    whether Ford's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h.    whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

i.    whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.    whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Ford's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.    whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

261.   **Typicality**: Plaintiffs' claims are typical of the claims of the Class because each Plaintiff purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by Ford's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Ford relating to the conduct alleged herein, and the same conduct on the part of Ford gives rise to all the claims for relief.

262.   **Adequacy**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

263.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk

inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

264.    **Injunctive Relief**: Ford has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750–1785**
**Plaintiff Maldonado Individually and on Behalf of the California Subclass Who Purchased or Leased a Class Vehicle for Personal Use**

265.    Plaintiff Maldonado incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

266.    Plaintiff Maldonado brings this claim individually and on behalf of the California Subclass members who purchased a vehicle for personal, family, or household use.

267.    Plaintiffs Maldonado and the members of the California Subclass are "consumers" as defined under the CLRA. *See* Cal. Civ. Code § 1761(d).

268.    Ford is a "person" as defined under the CLRA. *See* Cal. Civ. Code § 1761(c).

269.    Class Vehicles are "goods" as defined under the CLRA. *See* Cal. Civ. Code § 1761(a).

270.    The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

271.    Ford engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by knowingly and intentionally concealing from Plaintiff and the California Subclass members that the Class Vehicles suffer from the Oil Pump Defect (and the costs, risks,

and diminished value of the Class Vehicles as a result of this Defect). Ford's conduct violated at least the following enumerated CLRA provisions:

a.  Ford represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

b.  Ford represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

c.  Ford advertises its Class Vehicles with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

d.  Ford represents that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

e.  Ford inserts an unconscionable provision into its warranty in violation of section 1770(a)(19).

272.  Ford's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and created a serious safety hazard for the public.

273.  Ford knew, should have known, or was reckless in not knowing that the Class Vehicles were defective, posed a safety hazard, would fail prematurely, and were not suitable for their intended use.

274.  Ford was under a duty to Plaintiff and the California Subclass members to disclose the defective nature of the Class Vehicles and the Defect because:

a.  Ford knew of but actively concealed the Defect from Plaintiff and the California Subclass;

b.  Ford was in a superior and exclusive position to know the true facts about the Defect, which poses serious safety hazards and affects the central functionality of the vehicle, and Plaintiff and the Subclass members could

not reasonably have been expected to discover that the Class Vehicles contained the Defect until it manifested, which Ford knew; and

c.    Ford made partial representations regarding the reliability, safety, and quality but suppressed facts regarding the Defect.

275.    The facts that Ford misrepresented to and concealed from Plaintiff and the other California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Vehicles or pay a lesser price for them.

276.    The Defect poses a serious safety defect and affects the central functionality of a vehicle because it renders the vehicle inoperable.

277.    In failing to disclose the material Defect, Ford has knowingly and intentionally concealed material facts in breach of its duty to disclose.

278.    Plaintiff Maldonado and the California Subclass have suffered injury in fact and actual damages resulting from Ford's material misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff Maldonado and the Subclass known about the defective nature of the Class Vehicles and the Defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

279.    As a direct and proximate result of Ford's unfair and deceptive conduct, therefore, Plaintiff and the California Subclass members have been harmed.

280.    Pursuant to Cal. Civ. Code § 1782(a), on June 6, 2022, Plaintiff Maldonado sent a demand letter to Ford notifying it of its CLRA violations and providing it with an opportunity to correct its business practices. If Ford does not correct its business practices, Plaintiff Maldonado will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, and punitive damages under the CLRA.

281.    Pursuant to Cal. Civ. Code § 1780(a), Plaintiff Maldonado, individually and on behalf of the California Subclass, seeks injunctive relief for Ford's violation of the CLRA.

282.     Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiff Maldonado, individually and on behalf of the California Subclass, seek compensatory and punitive damages under the CLRA and to recover attorneys' fees and costs.

283.     Plaintiff's CLRA venue declaration is attached as Exhibit A to this complaint in accordance with Cal. Civ. Code § 1780(d).

## COUNT II
### Violations of the California Unfair Competitions Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200–17210
### Plaintiff Maldonado, Individually and on Behalf of the California Subclass

284.     Plaintiff Maldonado incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

285.     Plaintiff Maldonado brings this claim individually and on behalf of the California Subclass.

286.     The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Ford's conduct violates each of these prohibitions.

## Unlawful Conduct

287.     Ford's conduct is unlawful, in violation of the UCL, because, as set forth herein, it violates the Song–Beverly Consumer Warranty Act, the MMWA, and the CLRA.

## Unfair Conduct

288.     Ford's conduct is unfair because it violated California public policy, legislatively declared in the Song–Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The Defect renders the Class Vehicles unsafe, unreliable, and inoperable.

289.     Ford acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

a.   Knowingly selling Plaintiff Maldonado and California Subclass members Class Vehicles with the Defect;

b.   Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the Defect during the warranty period;

c.   Refusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period;

d.   Failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

e.   Failing to acknowledge the scope and severity of the Defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective, and failing to provide adequate relief.

290.   The gravity of the harm resulting from Ford's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the Defect harms the public at large and is part of a common and uniform course of wrongful conduct.

291.   There are reasonably available alternatives that would further Ford's business interests of increasing sales and preventing false warranty claims. For example, Ford could have: (a) acknowledged the Defect and provided a permanent, effective fix for the Defect; and/or (b) disclosed the Defect prior to prospective consumers' purchases.

292.   The harm from Ford's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent Defect, and Ford has failed to disclose it. Plaintiff and California Subclass members did not know of, and had no reasonable means of discovering, the Defect.

**Fraudulent Conduct**

293.    Ford's conduct is fraudulent in violation of the UCL. Ford's fraudulent acts include knowingly and intentionally concealing from Plaintiff and the California Subclass members the existence of the Defect and falsely marketing and misrepresenting the Class Vehicles as being functional, reliable and safe.

294.    Ford's misrepresentations and omissions alleged herein caused Plaintiff and the California Subclass members to purchase or lease their Class Vehicles or pay more than they would have had Ford disclosed the Defect.

295.    At all relevant times, Ford had a duty to disclose the Defect because it had superior and exclusive knowledge of the Defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because Ford made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the Defect.

296.    Accordingly, Plaintiff Maldonado and California Subclass members have suffered injury in fact, including lost money or property, as a result of Ford's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiff Maldonado and California Subclass members would not have purchased or lease their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

297.    Plaintiff Maldonado seeks appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin Ford from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore Plaintiff and California Subclass members any money Ford acquired by its unfair competition, including restitution. Plaintiff also seeks reasonable attorneys' fees and expenses under applicable law.

**COUNT III**

**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Express Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Maldonado, Individually and on Behalf of the California Subclass**

298.    Plaintiff Maldonado incorporates by reference each preceding and succeeding

paragraph as though fully set forth herein.

299.    Plaintiff Maldonado brings this claim individually and on behalf of the California Subclass who purchased or leased a Class Vehicle for Personal, Family or Household Purposes.

300.    Plaintiff Maldonado and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

301.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

302.    Defendant is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

303.    Defendant made express warranties to Plaintiff Maldonado and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

304.    Defendant breached these express warranties by selling and leasing defective Class Vehicles that required repair or replacement within the applicable warranty period and failing to adequately repair the alleged Defect.

305.    Defendant has failed to promptly replace or buy back the vehicles of Plaintiff and the proposed California Subclass members as required under Cal. Civ. Code § 1793.2(d)(2).

306.    As a direct and proximate result of Defendant's breach of its express warranties, Plaintiff Maldonado and the California Subclass members received goods in a condition that substantially impairs their value to Plaintiff Maldonado and the other Subclass members. Plaintiff and the California Subclass members have been damaged as a result of, *inter alia*, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

307.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff Maldonado and the California Subclass members who purchased for personal, family or household purposes are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

308.    Pursuant to Cal. Civ. Code § 1794(d), (e), Plaintiff Maldonado and the California Subclass members are entitled to reasonable costs and attorneys' fees.

**COUNT IV**

**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Maldonado, Individually and on Behalf of the California Subclass**

309.    Plaintiff Maldonado incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

310.    Plaintiff Maldonado brings this claim individually and on behalf of the California Subclass who purchased for personal, family or household purposes.

311.    Plaintiff Maldonado and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

312.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

313.    Defendant is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

314.    Defendant impliedly warranted to Plaintiff Maldonado and the California Subclass members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

315.    Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

316.    The Defect in the Class Vehicles is present in them when sold and is substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the Defect causes all, or substantially all, of the vehicles to experience oil pump failure and require full engine replacements, and dangerous inoperability while the vehicle is in motion. The Defect thus affects the central functionality of the vehicle, poses a serious safety risk to drivers and passengers, and causes increased maintenance costs.

317.    Because the Defect creates an unreasonable risk to driver and passenger safety, and because the Class Vehicles are unfit for their ordinary purpose due to the Defect, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

318.    Class Vehicles are not adequately labeled because the labeling fails to disclose the Oil Pump Defect and does not advise the California Subclass members of the Oil Pump Defect.

319.    Any attempt by Defendant to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to Sections 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). Defendant's attempted implied warranty disclaimer does not conform to these requirements.

320.    The Oil Pump Defect deprived Plaintiff Maldonado and the California Subclass members of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiff and other California Subclass members paid.

321.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiff Maldonado and the California Subclass members received goods that contain a defect that substantially impairs their value. Plaintiff Maldonado and the California Subclass members have

been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

322.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff Maldonado and the California Subclass members are entitled to damages and other legal and equitable relief, including, *inter alia*, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Vehicles, and reasonable attorneys' fees and costs.

## COUNT V

**Violation of Florida's Deceptive and Unfair Trade Practices Act**
**F.S.A. §§ 501.201-.213, *et seq*. ("FDUPTA")**
**Plaintiffs Martin and Wright Individually, and on Behalf of the Florida Subclass**

323.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

324.    Plaintiffs Martin and Wright bring this claim on behalf of the Florida Subclass.

325.    Plaintiffs Martin, Wright, and the Florida Subclass members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

326.    Ford engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

327.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

328.    Ford's acts and practices, described herein, are unfair in violation of Florida law because it violates Florida public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

329.    Ford acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner, in at least the following respects:

        a.    promoted and sold or leased Class Vehicles it knew were defective;

b.      failed to disclose the Oil Pump Defect, and represented through advertising and the Class Vehicles possess particular qualities that were inconsistent with Ford's actual knowledge of them;

c.      failed to make repairs or made repairs and provided replacements that caused Plaintiff and the Florida Subclass members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and

d.      minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers.

330.      The gravity of harm resulting from Ford's unfair conduct outweighs any potential utility. The practice of selling and leasing defective Class Vehicles without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

331.      The harm from Ford's conduct was not reasonably avoidable by consumers. Even after receiving a large volume of consumer complaints, Ford did not disclose the Defect. Plaintiffs Martin, Wright, and Florida Subclass members did not know of, and had no reasonable means of discovering, that Class Vehicles are defective.

332.      Ford also engaged in deceptive trade practices in violation of Florida law, by promoting the safety, convenience, and operability of Class Vehicles while willfully failing to disclose and actively concealing their defective nature.

333.      Ford committed deceptive acts and practices with the intent that consumers, such as Plaintiffs Martin, Wright and Florida Subclass members, would rely upon Ford's representations and omissions when deciding whether to purchase or lease a Class Vehicle.

334.      Plaintiffs Martin, Wright, and Florida Subclass members suffered ascertainable loss as a direct and proximate result of Ford's unfair and deceptive acts or practices. Had Plaintiffs Martin, Wright, and the Florida Subclass members known that the Class Vehicles are equipped

with engines containing the Oil Pump Defect, they would not have purchased and leased the Class Vehicles, or would have paid significantly less for the them. Among other injuries, they overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

335. Plaintiffs Martin, Wright, and the Florida Subclass members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and reasonable attorneys' fees under Fla. Stat. § 501.2105(1).

336. Plaintiffs Martin and Wright also seeks an order enjoining Ford's unfair and deceptive acts or practices pursuant to Fla. Stat. § 501.211, and any other just and proper relief available under the FDUTPA.

**COUNT VI**

**Breach of Express Warranty (Florida)**
**F.S.A. §§ 672.31, 680.21**
**Plaintiffs Martin and Wright, Individually and on Behalf of the Florida Subclass**

337. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

338. Plaintiffs Martin and Wright bring this cause of action individually and on behalf of the members of the Florida Subclass.

339. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

340. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

341. The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

342. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

343.    Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

344.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

345.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

346.    For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

347.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

348.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

349.    The Oil Pump Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs Martin, Wright and the Florida Subclass Members.

350.    Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

351.    Under the express Warranties, Ford was obligated to correct the Oil Pump Defect in the vehicles owned or leased by Plaintiffs Martin, Wright and the Florida Subclass Members.

352.    Although Ford was obligated to correct the Oil Pump Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

353.    Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Florida Subclass Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

354.    Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

355.    Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

356.    The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiffs Martin, Wright and the Florida Subclass Members. Among other things, Plaintiffs Martin, Wright and the Florida Subclass Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

357.    Plaintiffs Martin, Wright, and the Florida Subclass Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

358.     Plaintiffs Martin, Wright, and the Florida Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Oil Pump Defect from the complaints and service requests it received from Plaintiffs Martin, Wright and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

359.     Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Oil Pump Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Oil Pump Defect.

360.     Because Ford has not been able remedy the Oil Pump Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

361.     As a direct and proximate cause of Ford's breach, Plaintiffs Martin, Wright and the Florida Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Martin, Wright and the Florida Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

362.     As a direct and proximate result of Ford's breach of express warranties, Plaintiffs Martin, Wright and the Florida Subclass Members have been damaged in an amount to be determined at trial.

### COUNT VII

**Breach of the Implied Warranty of Merchantability (Florida)**
**F.S.A. §§ 672.314 and 680.212**
**(On Behalf of the Florida Subclass against Defendant)**
**Plaintiffs Martin and Wright, Individually and on Behalf of the Florida Subclass**

363.     Plaintiffs repeat and re-allege each and every allegation contained in each of the preceding and succeeding paragraphs as fully set forth herein.

364.    Plaintiffs Martin and Wright bring this cause of action individually and on behalf of the members of the Florida Subclass.

365.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

366.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

367.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

368.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Fla. Stat. §§ 672.314 and 680.212.

369.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Plaintiffs Martin, Wright, and the Florida Subclass Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiffs Martin, Wright, and the Florida Subclass Members, with no modification to the defective engines.

370.    Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

371.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

372.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs Martin, Wright, and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Oil Pump Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

373.    As a result of Ford's breach of the applicable implied warranties, Plaintiffs Martin, Wright and the Florida Subclass Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Oil Pump Defect, Plaintiffs Martin, Wright and the Florida Subclass Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

374.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Fla. Stat. §§ 672.314 and 680.212.

375.    Plaintiffs Martin, Wright, and the Florida Subclass Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

376.    Plaintiffs Martin, Wright, and the Florida Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Oil Pump Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

377.    Because Plaintiffs Martin, Wright, and the Florida Subclass Members purchased their vehicles from authorized Ford dealers, they are in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2)

privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and of the contracts between Ford and its authorized dealers.

378.    As a direct and proximate cause of Ford's breach, Plaintiffs Martin, Wright, and the Florida Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Martin, Wright, and the Florida Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

379.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs Martin, Wright and the Florida Subclass Members have been damaged in an amount to be proven at trial.

## COUNT VIII

### Violations of the Michigan Consumer Protection Act ("MCPA")
### MICH. COMP. LAWS §§ 445.901 – .922
### Plaintiffs Ptaszek and Drotos, Individually and on Behalf of the Michigan Subclass

380.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

381.    Plaintiffs Ptaszek and Drotos bring this claim on behalf of herself and the Michigan Subclass.

382.    Plaintiffs, Michigan Subclass members, and Ford fall within the definition of "person" under the MCPA. Mich. Comp. Laws § 445.902(d).

383.    The MCPA is designed to provide a remedy for consumers who are injured by deceptive business practices. The MCPA expressly allows for class actions on behalf of consumers who have suffered a loss as a result of a violation of the act. Mich. Comp. Laws § 445.911(3).

384.    Defendant's conduct alleged herein constitutes unfair, unlawful, unconscionable, and deceptive acts in violation of the MCPA, including, but not necessarily limited to, the following sections:

a.   Section 445.903(1)(c): Defendant represented that its Class Vehicles have characteristics, uses, or benefits that they do not have;

b.   Section 445.903(1)(e): Defendant represented that its Class Vehicles were of a particular standard, quality, or grade, when they were of another.

c.   Section 445.903(1)(s): Defendant failed to reveal material facts, the omission of which tended to mislead or deceive the consumers, and which fact could not reasonably be known by the consumers;

d.   Section 445.903(1)(bb): Defendant made representations of fact material to the transaction such that consumers reasonably believed the represented state of affairs to be other than it actually was; and

e.   Section 445.903(1)(cc): Defendant failed to reveal facts that were material to the purchase and lease of Class Vehicles in light of the representations of fact made in a positive manner.

385.   Specifically, as alleged herein, Defendant knowingly or recklessly made misrepresentations about the quality, characteristics, performance, and reliability of its Class Vehicles which contain the Oil Pump Defect and pose a safety hazard.

386.   Defendant concealed, omitted, and failed to disclose the truth about Class Vehicles in order to continue sales and increase profits.

387.   Defendant had a duty to disclose the material defect because it had exclusive knowledge of the Oil Pump Defect and such information was not reasonably accessible to Plaintiffs and the Michigan Subclass.

388.   Had Plaintiffs and the Michigan Subclass members known about the Oil Pump Defect, Plaintiffs and the class members would not have purchased or leased their Class Vehicles or would have paid significantly less for them.

389.   As a direct and proximate result of Defendant's business practices, Plaintiffs and proposed class members suffered injury in fact and lost money or property because they purchased and paid for Class Vehicles that they otherwise would not have purchased or would have paid

significantly less for them and because they have incurred out of pocket costs in the form of costly repairs and other out of pocket expenses.

390.    Plaintiffs and proposed class members are entitled to actual or statutory damages, attorneys' fees, an injunction, and other equitable relief, including restitutionary disgorgement of all profits accruing to Defendant because of its unfair and deceptive practices and such other orders as may be necessary to prevent the future use of these practices. Mich. Comp. Laws § 445.911.

<u>**COUNT IX**</u>

**Breach of Express Warranty (Michigan)**
**(Mich. Comp. Laws §§ 440.2313 and 440.2860)**
**Plaintiffs Ptaszek and Drotos, Individually and on Behalf of the Michigan Subclass**

391.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

392.    Plaintiffs Ptaszek and Drotos bring this cause of action individually and on behalf of the Michigan Subclass.

393.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

394.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

395.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

396.    Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

397.    Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

398.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied

materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

399.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

400.    For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

401.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

402.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

403.    The Oil Pump Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members.

404.    Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

405.    Under the express Warranties, Ford was obligated to correct the Oil Pump Defect in the vehicles owned or leased by Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members.

406. Although Ford was obligated to correct the Oil Pump Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

407. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Michigan Subclass Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

408. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

409. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

410. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members. Among other things, Plaintiff Ptaszek and Drotos and the Michigan Subclass Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

411. Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

412. Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Oil Pump Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from

repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

413.     Nonetheless, Plaintiffs Ptaszek and Drotos provided notice to Ford of the breach of the warranties when they repeatedly took their vehicle to an authorized Ford dealership and requested warranty repairs. Further, Plaintiffs Ptaszek and Drotos and provided written notice by letter dated May 23, 2023.

414.     Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Oil Pump Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Oil Pump Defect.

415.     Because Ford has not been able remedy the Oil Pump Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

416.     As a direct and proximate cause of Ford's breach, Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Ptaszek and Drotos and the Michigan Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

417.     As a direct and proximate result of Ford's breach of express warranties, Plaintiff Ptaszek and the Michigan Subclass Members have been damaged in an amount to be determined at trial.

## COUNT X

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.***
**Plaintiff Bilotta, Individually and on Behalf of the Pennsylvania Subclass**

418.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

419.    Plaintiff Bilotta brings this claim on behalf of herself and the members of the Pennsylvania Subclass.

420.    Plaintiff Bilotta and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

421.    All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Ford engaged in unfair and deceptive practices that violated the Pennsylvania CPL as described above.

422.    Defendant participated in and engaged in deceptive business or trade practices prohibited by the Pennsylvania CPL by failing to disclose and actively concealing the defective nature of the oil pump within the 1.0 L EcoBoost engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

423.    By failing to disclose the Oil Pump Defect; by concealing the Oil Pump Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Plaintiff Bilotta and the Pennsylvania Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge

that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

424.    Defendant systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Pump Defect in the course of its business.

425.    Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

426.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

427.    Defendant knew that the Class Vehicles and their 1.0L EcoBoost engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

428.    Defendant knew or should have known that its conduct violated the Pennsylvania CPL.

429.    Plaintiff Bilotta and the Pennsylvania Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

430.     Had Plaintiff Bilotta and the Pennsylvania Sub-Class Members known that the Class Vehicles would exhibit the Oil Pump Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

431.     Defendant owed Plaintiff Bilotta and the Pennsylvania Sub-Class Members a duty to disclose the truth about the Oil Pump Defect because Ford:.

a. possessed exclusive and superior knowledge of the design of the Class Vehicles and the Oil Pump Defect;

b. intentionally concealed the foregoing from Plaintiff Bilotta and the Pennsylvania Sub-Class Members;

c. had a duty under the Motor Vehicle Safety Act to disclose safety defects, which places a duty on manufacturers to report vehicle or equipment defects. 49 U.S.C. § 30118(c); and/or

d. made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Bilotta and the Pennsylvania Sub-Class Members that contradicted these representations.

432. Due to Ford's specific and superior knowledge that the 1.0L EcoBoost engine in the Class Vehicles will fail before their expected useful life has run due to the Oil Pump Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Plaintiff Bilotta and the Pennsylvania Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Oil Pump Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

433. Having volunteered to provide information to Plaintiff Bilotta and the Pennsylvania Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff Wright and the Pennsylvania Sub-Class Members.

434. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Plaintiff Bilotta and the Pennsylvania Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality,

and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time, far sooner than any reasonable consumer would expect, before the engines fail due to the Oil Pump Defect.

435.   Plaintiff Bilotta and the Pennsylvania Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Plaintiff Bilotta and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

436.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiff Bilotta and the Pennsylvania Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

437.   Defendant's violations present a continuing risk to Plaintiff Bilotta and the Pennsylvania Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

438.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Plaintiff Bilotta and members of the Pennsylvania Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Oil Pump Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

439.   Defendant is liable to Plaintiff Bilotta and the Pennsylvania Sub-Class Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Plaintiff Wright and the Pennsylvania Sub-Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XI

**Breach of Express Warranty (Pennsylvania)**
**(13 PA. CONS. STAT. §§ 2313 and 2A210)**
**Plaintiff Bilotta, Individually and on Behalf of the Maryland Subclass**

440.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

441.    Plaintiff Bilotta brings this cause of action on her behalf and on behalf of the Maryland Subclass.

442.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

443.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

444.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

445.    Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

446.    Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

447.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

448.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat

housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

449.    For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

450.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

451.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

452.    The Oil Pump Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiff Bilotta and the Pennsylvania Subclass Members.

453.    Plaintiff Bilotta and the Pennsylvania Subclass Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

454.    Under the express Warranties, Ford was obligated to correct the Oil Pump Defect in the vehicles owned or leased by Plaintiff Bilotta and the Pennsylvania Subclass Members.

455.    Although Ford was obligated to correct the Oil Pump Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

456.    Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Pennsylvania Subclass Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

457.    Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

458.    Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

459.    The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff Bilotta and the Pennsylvania Subclass Members. Among other things, Plaintiff Bilotta and the Pennsylvania Subclass Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

460.    Plaintiff Bilotta and the Pennsylvania Subclass Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

461.    Plaintiff Bilotta and the Pennsylvania Subclass Members sent ford a notice and demand on June 2, 2023. They also were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Oil Pump Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

462.    Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Oil Pump Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Oil Pump Defect.

463.    Because Ford has not been able remedy the Oil Pump Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

464.    As a direct and proximate cause of Ford's breach, Plaintiff Bilotta and the Pennsylvania Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Bilotta and the Pennsylvania Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

465.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff Bilotta and the Pennsylvania Subclass Members have been damaged in an amount to be determined at trial.

## COUNT XII

### Breach of Implied Warranty of Merchantability (Pennsylvania)
### (13 PA. CONS. STAT. §§ 2314 and 2A212)
### Plaintiff Bilotta, Individually and on Behalf of the Pennsylvania Subclass

466.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

467.    Plaintiff Bilotta brings this cause of action on her behalf and on behalf of the Pennsylvania Subclass.

468.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

469.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

470.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

471.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

472.     Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Bilotta and members of the Pennsylvania Subclass bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Bilotta and members of the Pennsylvania Subclass, with no modification to the defective Class Vehicles.

473.     Ford provided Plaintiff Bilotta and members of the Pennsylvania Subclass with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

474.     This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

475.     Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

476.     As a result of Ford's breach of the applicable implied warranties, Plaintiff Bilotta and members of the Pennsylvania Subclass suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff Bilotta and members of the Pennsylvania Subclass were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

477. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

478. Plaintiff Bilotta and members of the Pennsylvania Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

479. Plaintiff Bilotta and members of the Pennsylvania Subclass were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Plaintiff Bilotta and members of the Pennsylvania Subclass and through other internal sources.

480. Nonetheless, Plaintiffs provided notice to Ford of the breach of implied warranties when they repeatedly took their vehicle to an authorized Ford dealership and requested warranty repairs.  Further, Plaintiff Bilotta provided written notice by letter dated June 2, 2023.

481. As a direct and proximate cause of Ford's breach, Plaintiff Bilotta and members of the Pennsylvania Subclass suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Bilotta and members of the Pennsylvania Subclass have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

482. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Bilotta and members of the Pennsylvania Subclass have been damaged in an amount to be proven at trial.

## COUNT XIII

**Violation of the Texas Deceptive Trade Practices Act**
**Texas Bus. & Com. Code § 17.41, et seq.**
**Plaintiffs Bolton and Vasquez, Individually and on Behalf of the Texas Subclass**

483.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

484.   Plaintiffs Bolton and Vasquez brings this claim on behalf of himself and the members of the Texas Subclass.

485.   Plaintiffs Bolton, Vasquez, and members of the Texas Subclass are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41 and are therefore "consumers" pursuant to Tex. Bus. & Corn. Code § 17.45(4).

486.   Ford is a "person" as that term is defined in Tex. Bus. & Corn. Code § 17.45(3).

487.   Ford is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

488.   The Texas Deceptive Trade Practices ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Corn. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

489.   Ford participated in unfair or deceptive trade practices that violated the Texas DTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally

misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

490.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

491.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

492.    Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or used improper or deficient materials, and were not suitable for their intended use.

493.    Ford knew or should have known that its conduct violated the Texas DTPA.

494.    Defendant was under a duty to Plaintiff Bolton, Vasquez, and the Texas Subclass Members to disclose the defective nature of the Class Vehicles because:

        a.      Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles

        b.      Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles;

        c.      Defendant was under an obligation to disclose safety defects under federal motor vehicle safety laws; and

        d.      Defendant actively concealed the defective nature of the Class Vehicles from Texas Plaintiff and the Texas Subclass Members at the time of sale and thereafter.

495.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

496.    The facts concealed or not disclosed by Defendant to Plaintiffs Bolton, Vasquez and the Texas Subclass Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle becomes inoperable when the differential fails is a material safety concern. Had Plaintiffs Bolton, Vasquez and the Texas Subclass Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

497.    Plaintiffs Bolton, Vasquez, and the Texas Subclass Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

498.    As a result of Defendant's misconduct, Plaintiffs Bolton, Vasquez, and the Texas Subclass Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

499.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs Bolton, Vasquez and the Texas Subclass Members have suffered and will continue to suffer actual damages.

500.    Ford's violations present a continuing risk to Plaintiffs Bolton, Vasquez and the Texas Subclass Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

501.    Pursuant to statute, Plaintiffs Bolton and Vasquez each provided notice of their claims by letters dated May 23, 2023 and June 2, 2023. Plaintiffs Bolton, Vasquez and members of the Texas Subclass seek all damages and relief to which they are entitled to because Ford failed to remedy its unlawful conduct within the requisite time period.

502.    Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs Bolton, Vasquez, and members of the Texas Subclass seek an order enjoining Ford from engaging in unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations,

pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

### COUNT XIV

**Breach of Express Warranty (Texas)**
**(TEX. BUS. & COM. CODE §§ 2.313 AND 2A.210)**
**Plaintiffs Bolton, Vasquez, Individually and on Behalf of the Texas Subclass**

503.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

504.    Plaintiffs Bolton and Vasquez bring this cause of action individually and on behalf of the Texas Subclass.

505.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Corn. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

506.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Corn. Code § 2A.103(a)(16).

507.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

508.    Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

509.    Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

510.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

511.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

512.    For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

513.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

514.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

515.    The Oil Pump Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs Bolton, Vasquez and the Texas Subclass Members.

516.    Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

517.    Under the express Warranties, Ford was obligated to correct the Oil Pump Defect in the vehicles owned or leased by Plaintiffs Bolton, Vasquez and the Texas Subclass Members.

518.    Although Ford was obligated to correct the Oil Pump Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

519.    Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Texas Subclass

Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

520.    Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

521.    Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

522.    The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff Vasquez and the Texas Subclass Members. Among other things, Plaintiffs Bolton, Vasquez and the Texas Subclass Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

523.    Plaintiffs Bolton, Vasquez and the Texas Subclass Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

524.    Plaintiffs Bolton, Vasquez and the Texas Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Oil Pump Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

525.    Nonetheless, Plaintiffs Bolton and Vasquez provided notice to Ford of the breach of the warranties when they repeatedly took their vehicle to an authorized Ford dealership and

requested warranty repairs. Further, Plaintiff Vasquez provided written notice by letter dated May 23, 2023.

526.    Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Oil Pump Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Oil Pump Defect.

527.    Because Ford has not been able remedy the Oil Pump Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

528.    As a direct and proximate cause of Ford's breach, Plaintiffs Bolton, Vasquez and the Texas Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Bolton, Vasquez and the Texas Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

529.    As a direct and proximate result of Ford's breach of express warranties, Plaintiffs Bolton, Vasquez and the Texas Subclass Members have been damaged in an amount to be determined at trial.

## COUNT XV
### Breach of Implied Warranty of Merchantability (Texas)
### (Tex. Bus. & Com. Code §§ 2.314 and 2A.212)
### Plaintiff Vasquez, Individually and on Behalf of the Texas Subclass

530.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

531.    Plaintiffs Bolton and Vasquez bring this cause of action individually and on behalf of the Texas Subclass.

532.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Corn. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

533.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Corn. Code § 2A.103(a)(16).

534.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

535.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

536.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Bolton, Vasquez and the Texas Subclass members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Vasquez and the Texas Subclass members, with no modification to the defective Class Vehicles.

537.    Ford provided Plaintiffs Bolton, Vasquez and the Texas Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

538.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

539.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

540.     As a result of Ford's breach of the applicable implied warranties, Plaintiffs Vasquez, Bolton, and the Texas Subclass members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs Vasquez, Bolton and the Texas Subclass members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

541.     Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

542.     Plaintiffs Bolton, Vasquez and the Texas Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

543.     Plaintiffs Bolton, Vasquez and the Texas Subclass members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Plaintiff Vasquez and the Texas Subclass members and through other internal sources.

544.     As a direct and proximate cause of Ford's breach, Plaintiffs Bolton, Vasquez and the Texas Subclass members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Vasquez and the Texas Subclass members have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

545.     As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs Bolton, Vasquez and the Texas Subclass members have been damaged in an amount to be proven at trial.

## COUNT XVI
### Unjust Enrichment

**In the Alternative to All Other Claims**
**All Plaintiffs, Individually and on Behalf of the State Subclasses**

546.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

547.     Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

548.     This claim is pleaded in the alternative to the other claims set forth herein.

549.     As the intended and expected result of its conscious wrongdoing, Ford has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

550.     In particular, the value of the Class Vehicles was artificially inflated by Ford's concealment of the Oil Pump Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

551.     As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Ford charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to Ford's authorized distributors and dealers, which are in Ford's control and from whom Ford receives monetary benefits..

552.     Moreover, Ford continues to profit from its ongoing wrongful behavior by denying the nature and existence of the Oil Pump Defect to Plaintiffs and Class Members during the duration of the Warranties, refusing to honor the Warranties, and selling replacement parts to Plaintiffs and the Class Members.

553.     Ford has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Ford had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle unreliable and poses a serious safety risk.

554.    Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct.

555.    Ford has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and monies from Plaintiffs and Class Members rightfully belonging to them.

556.    Equity and good conscience militate against permitting Ford to retain these profits and benefits from its wrongful conduct.

557.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

558.    Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

559.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT XVII
### Violation of the Magnuson-Moss Warranty Act,
### 15 U.S.C. §§ 2301, *et seq.*
### All Plaintiffs, Individually

560.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

561.    Plaintiffs bring this cause of action individually.

562.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

563.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

564.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

565.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

566.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

567.    In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

568.    Ford's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

569.    With respect to Plaintiffs' purchases of the Class Vehicles, the terms of Ford's written warranty and implied warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiffs, on the other.

570.    Ford breached the implied warranty of merchantability. Without limitation, the Class Vehicles have engines that leak coolant, overheat, fail, and in some instances catch fire, as described above, and which thus render the Class Vehicles unmerchantable.

571.    Ford breached its express Limited Warranty by refusing to repair the defective engines in the Class Vehicles. Plaintiffs presented their vehicles for repair and Ford failed to remedy the Oil Pump Defect, whether by refusing to repair or replace the engine, providing ineffective repairs,  installing another engine with the same Oil Pump Defect, or otherwise.

572.    Plaintiffs Ptaszek and Drotos, individually and on behalf of the members of the proposed Class, notified Ford of the Oil Pump Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter delivered by courier on May 23, 2023 to Ford's registered agent in Plymouth, Michigan.

573.    Ford was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships. Ford has not remedied the breach.

574.    Further, Ford has refused to provide an adequate warranty repair for the Oil Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to oil pressure problems and engine failure have simply been provided either replacement parts that do nothing to fix the Oil Pump Defect, or replacement defective engines.

575.    At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Oil Pump Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and futile, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

576.    The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

577.    As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs have sustained damages in an amount to be determined at trial.

578.    Plaintiffs seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT XVIII

**Fraud by Omission or Fraudulent Concealment
All Plaintiffs, Individually and on Behalf of the Nationwide Class,
Or, in the Alternative, on Behalf of All Subclasses**

579.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

580.   Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class against Defendant as there are no true conflicts among the states' laws of fraudulent concealment/omission.  Defendant is liable for both fraudulent concealment and non-disclosure, including the resultant fraudulent inducement.  *See, e.g.*, Restatement (Second) Torts §§ 550-51 (1977). In alternative, Plaintiffs bring this claim on behalf of each of the State Subclasses, against Defendant.

581.   Ford distributed and sold the Class Vehicles in all 50 states.  Ford also drafted, distributed, and disseminated the same advertising materials in all 50 states, including on the website it maintains to advertise the Class Vehicles.  Those materials omitted any mention of the Defect and its associated safety concerns.

582.   Ford also drafted the Monroney Stickers which were affixed to Class Vehicles and contained other safety information about the vehicles, including the safety systems available on the vehicles such as airbags, autonomous braking and other systems, but failed to disclose the Defect and its associated safety concerns.

583.   Ford knew that the Class Vehicles suffered from an inherent Oil Pump Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

584.   Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

585.   Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

586.    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

      a.    The omitted facts were material because they directly impact the safety of the Class Vehicles;

      b.    Defendant knew the omitted facts regarding the Oil Pump Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

      c.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

      d.    Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

587.    Ford also had a statutory duty to disclose known safety defects to consumers and NHTSA under federal motor vehicle safety law.

588.    The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a Class Vehicle's oil pump is defective, which can cause the vehicle to go into limp mode, lose power while driving, and complete failure, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

589.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendant's defective Class Vehicles.

590.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

591.     As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

592.     Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, hereby requests that this Court enter an Order against Ford providing for the following:

A.     Certification of the proposed Class, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

B.     An order permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint

C.     Injunctive relief in the form of a recall or free replacement/repair program;

D.     Equitable relief, including in the form of buyback of the Class Vehicles;

E.     Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.     An Order requiring Ford to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G.     An award of reasonable attorneys' fees and costs as permitted by law; and

H.     Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Respectfully submitted,

Dated: June 9, 2023

/s/ *Scott M. Tucker*

Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
**CHIMICLES SCHWARTZ KRINER &**
**DONALDSON-SMITH LLP**
2711 Centerville Rd., Suite 201
Wilmington, DE 19808
Tel.: 302-656-2500
rjk@chimicles.com
smt@chimicles.com

Timothy N. Mathews (*pro hac vice forthcoming*)
Alex M. Kashurba (*pro hac vice forthcoming*)
**CHIMICLES SCHWARTZ KRINER**
 **& DONALDSON SMITH LLP**
361 W. Lancaster Avenue
Haverford, Pennsylvania 19041
Tel: (610) 642-8500
tnm@chimicles.com
amk@chimicles.com

Russell D. Paul (Bar No. 4647)
Abigail Gertner (*pro hac vice forthcoming*)
Amey J. Park (*pro hac vice forthcoming*)
Natalie Lesser (*pro hac vice forthcoming*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:     (215) 875-3000
Fax:     (215) 875-4604
rpaul@bm.net
agertner@bm.net
apark@bm.net
nlesser@bm.net

Tarek H. Zohdy (*pro hac vice forthcoming*)

Cody R. Padgett (*pro hac vice forthcoming*)
Laura E. Goolsby (*pro hac vice forthcoming*)
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel.:    (310) 556-4811
Fax:    (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com

*Counsel for Plaintiffs and the Proposed Putative Class Members*