# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLON BOLTON, JENNY PTASZEK,
GINA BILOTTA, VERONICA
MALDONADO, JOHN WRIGHT,
MARGARET VASQUEZ, TRACEY
DROTOS, SCOTT MARTIN, MELISSA
ALLARD, LISA RUTHERFORD,
MAKAYLA BONVILLAIN, GINA
CARRELL, and MICHAEL CARRELL on
behalf of themselves and all others similarly
situated,

                    Plaintiffs,

        v.

FORD MOTOR COMPANY,

                  Defendant.

Civil Action No. 23-00632-GBW

---

Robert J. Kriner, Jr., Scott M. Tucker, CHIMICLES SCHWARTZ KRINER & DONALDSON-
SMITH LLP, Wilmington, Delaware; Timothy N. Mathews, Alex M. Kashurba, CHIMICLES
SCHWARTZ KRINER & DONALDSON-SMITH LLP, Haverford, Pennsylvania; Russell D.
Paul, Abigail J. Gertner, Amey J. Park, Natalie Lesser, BERGER MONTAGUE PC,
Wilmington, Delaware; Tarek H. Zohdy, Cody R. Padgett, Laura E. Goolsby, CAPSTONE LAW
APC, Los Angeles, California

     *Counsel for Plaintiffs*

Christian J. Singewald, WHITE & WILLIAMS, Wilmington, Delaware

     *Counsel for Defendant*

## **MEMORANDUM OPINION**

July 8, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
U.S. DISTRICT JUDGE

Pending before the Court is Defendant Ford Motor Company's ("Ford" or "Defendant")
Motion to Dismiss Counts I – XVIII of the First Amended Complaint ("FAC") (D.I. 15) filed by
Plaintiffs Marlon Bolton, Jenny Ptaszek, Gina Bilotta, Veronica Maldonado, John Wright,
Margaret Vasquez, Tracey Drotos, Scott Martin, Melissa Allard, Lisa Rutherford, Makayla
Bonvillain, Gina Carrell, and Michael Carrell (the "named Plaintiffs"), on behalf of themselves
and all others similarly situated (collectively as a class, "Plaintiffs"). D.I. 23. Having reviewed
the FAC, Defendant's Motion to Dismiss, and all related briefing, the Motion is **GRANTED-IN-
PART** and **DENIED-IN-PART**. Defendant's Motion is GRANTED without prejudice and with
leave for Plaintiffs to amend as to: (1) Plaintiffs' Express Warranty Claims (2) Plaintiffs Ptaszek
and Drotos' Magnuson-Moss Warranty Act claims; and (3) Plaintiffs' claims seeking equitable
relief. Defendant's Motion is GRANTED with prejudice as to Plaintiffs' claims under the
Michigan Consumer Protection Act and DENIED without prejudice as to Plaintiffs' California
common law omission claims. Defendant's Motion to Dismiss is otherwise DENIED.

## I.    BACKGROUND

Plaintiffs initiated this action by filing a class action complaint on June 9, 2023. D.I. 1.
The FAC followed on September 15, 2023. D.I. 15. The FAC alleges that Ford violated common
and statutory law by selling and leasing vehicles equipped with defective 1.0L EcoBoost engines
("Class Vehicles"), including the Ford Fiesta, Ford EcoSport, and Ford Focus. *Id.*, ¶¶ 1-3.
Specifically, the FAC alleges that Ford failed to disclose a "defect that prevents oil from circulating
properly that destroys the engine, leaving consumers with a repair bill that frequently exceeds the
value of the engine" (the "Defect"). *Id.*, ¶ 6.

On December 22, 2023, Ford recalled 2016-2018 model years of the Ford Focus and the 2018-2022 Ford EcoSport. D.I. 24 at 3. The recall states that the "engine oil pump drive belt tensioner arm may fracture, separate from the tensioner backing plate, and/or the oil pump drive belt material may degrade and lose teeth, resulting in a loss of engine oil pressure." D.I. 24, Ex. A, Part 573 Safety Recall Report. When this defect manifests, the "instrument cluster will display a low oil pressure warning message and may also display a check engine light." *Id.* The recall provides that Ford first identified a potential issue in February 2022 but concluded at the time that the issue "did not present an unreasonable risk to motor vehicle safety." *Id.*

This case involves thirteen named plaintiffs (the "Named Plaintiffs", representing the "Class Members"). *See generally* D.I. 15.

The Named Plaintiffs' information is represented by the following table:

| Name | State of Residence | State of Acquisition | Date of Acquisition | Type of Acquisition | Approximate Miles on Car at Time of Failure |
|------|--------------------|----------------------|----------------------|----------------------|---------------------------------------------|
| **Marlon Bolton** | Oregon | Texas | September 2018 | Purchase of new 2018 EcoSport | 64,000 |
| Jenny Ptaszek | Michigan | Michigan | August 2018 | Purchase of new 2018 EcoSport | 60,705 |
| Gina Bilotta | New Jersey | Pennsylvania | May 2019 | Purchase of new 2019 EcoSport | 64,000 |
| Margaret Vazquez | Texas | Texas | November 2019 | Purchase of new 2019 EcoSport | 79,300 |
| Scott Martin | Florida | Florida | April 2019 | Purchase of new 2018 Ford EcoSport | 65,000 |
| Melissa Allard | North Carolina | North Carolina | July 2019 | Purchase of new 2019 EcoSport | 60,000 |

| Lisa Rutherford | Tennessee | Tennessee | July 2020 | Purchase of new 2020 EcoSport | 87,000 |
|---|---|---|---|---|---|
| Gina and Michael Carrell | Texas | Texas | January 2021 | Purchase of new 2020 EcoSport | 77,000 |
| Veronica Maldonado | Michigan | Michigan | October 2018 | Lease, and later purchase, of 2018 Ford EcoSport | 65,000 |
| John Wright | Maryland | Florida | July 2020 | Purchase of used 2019 EcoSport with 31,282 miles | 62,000 |
| Tracey Drotos | Michigan | Michigan | August 2019 | Lease of 2019 EcoSport | 65,000 |
| Makayla Bonvillain | Louisiana | Louisiana | March 2023 | Purchase of used 2018 EcoSport | 82,000 |

D.I. 15, ¶¶ 16-214.  Plaintiffs assert causes of action under Federal, Texas, Michigan, Pennsylvania, California, Florida, North Carolina, Tennessee, and Louisiana law, with subclasses for purchasers of Class Vehicles in each of those states.  D.I. 15, ¶ 323.

## II.    LEGAL STANDARD

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021)

4

(quoting *Iqbal*, 556 U.S. at 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

In evaluating a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pinnavaia v. Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), *aff'd*, 2018 WL 11446482 (3d Cir. Apr. 6, 2018). Rule 12(b)(6) requires the court to accept all factual allegations in the complaint as true and view them in the light most favorable to plaintiff. *AbbVie Inc*, 976 F.3d at 351. The court may consider matters of public record and documents attached to, "integral to[,] or explicitly relied upon in" the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up); *see also Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (same). "A motion to dismiss 'may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420).

## III.  ANALYSIS

### A. Dismissal Is Not Warranted Under the Prudential Ripeness Doctrine or the Prudential Mootness Doctrine.

Ford contends that "[none] of the named plaintiffs have taken advantage of the 2023 recall;" thus, making Plaintiffs' claims unripe for judicial adjudication. D.I. 24 at 7. Thus, according to Ford, Plaintiffs' claims are not ripe for judicial adjudication. *Id.* In response, Plaintiffs contend that the justiciability of their claims is "more properly examined through the lens of mootness, rather than standing or ripeness." D.I. 25 at 5. While the Court agrees that the

justiciability of Plaintiffs' claims is best examined under mootness principles,[1] the Court finds that dismissal is not warranted under either doctrine.

### i. *The prudential ripeness doctrine does not apply.*

The doctrine of prudential ripeness "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotations omitted). "At its core, ripeness works 'to determine whether a party has brought an action prematurely . . . and counsels abstention until such a time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (citing *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)). To evaluate the prudential component of ripeness, courts weigh two considerations: (1) "the fitness of the issues for judicial decision" and (2) "the hardship of the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

In support of its motion, Ford contends that Plaintiffs' claims are not ripe for judicial review until Plaintiffs have taken advantage of Ford's 2023 recall. D.I. 24 at 8. According to Ford, the recall provides for free replacement of a part believed to be resulting in the Defect. *Id.* Thus, until Plaintiffs avail themselves of the recall, their lawsuit regarding the Defect "'ask[s] the Court to deal in hypotheticals'" and thus fails under the doctrine of prudential ripeness. *Id.* (internal citations omitted). In support of its ripeness claims, Ford cites *Elkins v. Am. Honda Motor Co.*, 2020 WL 4882412 (C.D. Cal. July 20, 2020). *Id.*

---

[1] The recall was initiated after the filing of the FAC, making it an "intervening event[]" that must be analyzed for its impact on jurisdiction. *Wigton v. Berry*, 949 F. Supp. 2d 616, 640 (W.D. PA. 2013); *see also Hickman v. Subaru of Am., Inc.*, 2022 WL 11021043, at *5 (D.N.J. Oct. 19, 2022) (applying mootness when a recall was announced after the filing of the operative complaint).

In *Elkins*, two plaintiffs filed a class action against a vehicle manufacturer for leasing and selling class members vehicles with defective AC condensers. *Elkins*, 2020 WL 4882412, at \*1. Similar to the instant action, the defendant manufacturer moved to dismiss plaintiffs' claims on the grounds that the plaintiffs had not taken advantage of an extended warranty program announced by the manufacturer sometime after plaintiffs filed their original complaint. *Id.* at \*2-3. The *Elkins* court noted that the "[p]laintiffs' allegations and claims concern[ed] in large part the sufficiency and adequacy of [the defendant's] warranties," as the plaintiffs were arguing that the warranties, including the warranty extension program, would not provide the class members with full relief. *Id.* at \*5. The defendant in *Elkins*, recognizing that the plaintiffs had yet to receive information about the scope and parameters of the warranty extension program, argued, and the court agreed, that the plaintiffs could not "claim to have enough information to conclude that [the] warranty extension [was] ineffectual . . . ." *Id.* According to the court, "[p]laintiffs take issue with [defendant's] response to an alleged defect, but they rushed to file their amended complaint before [the] response could play out, asking the Court to deal in hypotheticals." *Id.* The court explained, "[o]nce [p]laintiffs have availed themselves—or attempted to avail themselves—of [the] warranty extension program, including its reimbursement aspect, a court will be better positioned to rule on the efficacy and legal sufficiency of [the] warranties, as well as whether [the defendant manufacturer] breached any of its warranties, if such a ruling becomes necessary." *Id.* Before then, the court declined to find that plaintiffs' claims were ripe for judicial decision. *Id.* (citing *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003) (noting that "[i]ssues are fit for judicial decision 'when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now'")).

7

While Plaintiffs have similarly not availed themselves to Ford's 2023 recall, this matter differs from *Elkins* in one key respect: the claims and allegations made by plaintiffs in *Elkins* "concern[ed] in large part the sufficiency and adequacy of [defendant's] warranties." *Id.* ("[W]ithout putting [defendant's] warranty extension to use—indeed, less than a month after [defendant] announced it—[p]laintiffs filed their First Amended Complaint, claiming that a warranty program they have yet to take advantage of 'fails to make Class Members whole.'"). Here, on the other hand, Plaintiffs' claims do not turn on the sufficiency of the 2023 recall, and Ford concedes that "Plaintiffs do not allege that the recalls are inadequate." D.I. 24 at 8; *see also* D.I. 25 at 11 (Plaintiffs agreeing to assume "the efficacy of the recall . . . for purposes of legal argument"). Because Plaintiffs are not asking the Court to rule on the recall, the Court agrees with Plaintiffs that "there are no pertinent unknown facts to be discovered later that are necessary for the Court to adjudicate Plaintiffs' claims." D.I. 25 at 11.

Moreover, while the recall offers Class Members a "part replacement . . . free of charge," the FAC asserts that Plaintiffs suffered damages well beyond the cost of repairing or replacing the defective 1.0 EcoBoost engines and seeks recovery for the diminution in value of their vehicles, towing costs, rental car costs, and other out-of-pocket expenses.[2] D.I. 15, ¶ 11. By claiming their entitlement to these additional damages, "Plaintiffs assert that the [recall] does not make them whole." *Rosen v. Mercedes-Benz USA, LLC*, 2022 WL 20766104, at *3 (N.D. Ga. Nov. 1, 2022)

---

[2] In response to Plaintiffs' allegations that they incurred expenses not covered by the recall, Ford contends that Plaintiffs "do not make any specific allegations in the FAC supporting that contention." D.I. 26 at 3. The Court disagrees. The FAC asserts the exact "out of pocket costs" incurred by named Plaintiffs as a result of the alleged Defect. *See, e.g.*, D.I. 15, ¶ 93 (asserting that Plaintiff Wright incurred $100 in towing costs); *Id.*, ¶ 107 (alleging that Plaintiff Vasquez paid $200 in towing costs and $500 to transport her vehicle to a third-party mechanic shop); *Id.*, ¶ 174 (asserting that Plaintiff Rutherford incurred $1,069 in rental fees). Thus, the Court finds no basis to assume that the recall would fully address the unreimbursed damages.

(declining to find prudential ripeness where plaintiffs alleged that the "the Program does not provide any reimbursement for diminution of value of the vehicles at issue"). Since "Plaintiffs actually alleged that they suffered [added] damages, they [] have concrete injuries that could provide a basis for standing." *See Diaz v. Ford Motor Co.*, No. 23-10029, 2023 WL 6164455, at \*4 (E.D. Mich. Sept. 21, 2023). Thus, the Court disagrees with Ford's claims that the current dispute is not ripe for resolution.

ii. *The Court will not dismiss the FAC on mootness grounds.*

In cases where, as here, a manufacturer announces a recall program to remedy the defect central to a pending case and plaintiffs choose to pursue their claims despite the recall, courts have examined the justiciability of plaintiffs' claims under the doctrine of prudential mootness. *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012) (Gorsuch, J.) ("By filing documents with NHTSA notifying it of a defect, Toyota set into motion the great grinding gears of a statutorily mandated and administratively overseen national recall process. . . . The company has assumed as well the statutory duty to 'remedy the defect or noncompliance without charge when the vehicle or equipment is presented for remedy.'"). Thus, the question of whether Plaintiffs should avail themselves of the recall before seeking remedy from this Court is best examined under the doctrine of prudential mootness.

"The central question in a prudential mootness analysis is 'whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.'" *Sierra Club v. U.S. Army Corps of Engineers*, 277 F. App'x 170, 172–73 (3d Cir. 2008) (quoting *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)). Prudential mootness is distinct from Article III mootness, which comes into play only when there is no longer a "case or controversy" to bestow

jurisdiction on a federal court. *Id.* at 172. Under the doctrine of prudential mootness, on the other hand, a court can "decline to exercise [its] discretion to grant declaratory and injunctive relief" when granting such a remedy would not provide any meaningful relief due to changed circumstances. *Id.* "The discretionary power to withhold injunctive and declaratory relief for prudential reasons, even in a case not constitutionally moot, is well established." *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 862 n.1 (3d Cir. 2012). Where "no answer has been filed, this Court construes Defendants' arguments on mootness as facial attacks on standing." *Hickman*, 2022 WL 11021043, at *5 (D.N.J. Oct. 19, 2022).

In *Winzler*, the Tenth Circuit upheld a district court's decision dismissing product defect claims brought against a vehicle manufacturer. *Winzler*, 681 F.3d at 1209-10. In doing so, the Tenth Circuit noted that plaintiff in *Winzler* sought an injunction from the court "requiring [defendant] to notify all relevant owners of the defect and then to create and coordinate an equitable fund to pay for repairs." *Id.* at 1209. According to the Tenth Circuit, dismissal was warranted considering defendant's newly announced recall program, which was monitored by the National Highway Transportation Safety Administration ("NHTSA"), that entitled class members to a free repair of the defective engines. *Id.* at 1212. Specifically, the circuit court noted that, given defendant's recall, plaintiff now "ha[d] in hand a remedial commitment," secured by the continuing oversight from the NHTSA, an executive government agency, that promised to remedy the alleged defect. *Id.* Thus, "there remain[ed] not enough value [] for the courts to add in this case to warrant carrying on with the business of deciding its merits." *Id.* at 1211. Similarly, in *Diaz*, a district court dismissed defect claims brought against a vehicle manufacturer on grounds that defendant had already engaged in a NHTSA recall process to repair the alleged defect in all class vehicles. 2023 WL 6164455, at *4-5. Similar to *Winzler*, plaintiffs in *Diaz* sought equitable

10

relief from the court in the form of declaratory relief, "including, without limitation, an order that requires [d]efendant to repair the Class Vehicles," and the *Diaz* court found "[the manufacturer's] promise to remedy the [alleged] defect, backed by the NHTSA, render[ed] Plaintiffs' claims for injunctive and declaratory relief prudentially moot." *Id.* at *5-6.

The court in *Diaz* warned, however, that the doctrine of prudential mootness would not apply "if the recall remedy [would] leave[] Plaintiffs without complete relief." *Id.* at *6. Plaintiffs here similarly contend that dismissal is not warranted "because the recall does not compensate Plaintiffs for all of the damages they have incurred." D.I. 25 at 9. Plaintiffs note that, under comparable circumstances where parties have sought damages or remedies beyond what was offered by the recall, courts often find that the doctrine of prudential mootness is inapplicable. D.I. 25 at 5-6; *see also Hickman*, 2022 WL 11021043, at *5 ("To dismiss the action now would be to dismiss the matter without giving Plaintiffs a chance to seek complete relief."); *Sater v. Chrysler Grp. LLC*, No. EDCV1400700VAPDTBX, 2014 WL 11412674, at *5 (C.D. Cal. Oct. 7, 2014) ("To be sure, ordering Chrysler to replace the tie rods would duplicate the NHTSA-supervised recall, but holding it accountable for the other alleged injuries affords relief the recall does not provide. Dismissing this case as prudentially moot would likely leave the owners of Class Vehicles without complete relief.") (internal quotation marks omitted); *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2016 WL 693283, at *9 (N.D. Cal. Feb. 22, 2016) (same).

Because Plaintiffs allege damages that exceed what is being offered under the 2023 recall, the Court agrees that dismissal on mootness grounds is unlikely. *See Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 41 (3d Cir.1985) ("[T]he availability of damages or other monetary relief almost always avoids mootness.... Damages should be denied on the merits, not on the grounds of mootness."). However, Ford advanced only the issue of prudential ripeness in support

of its motion to dismiss the FAC. *See* D.I. 26 at 3 ("[I]n arguing primarily against mootness—an issue Ford did not even advance in its motion—Plaintiffs give short shrift to why their claims should not be dismissed under the prudential ripeness doctrine."). Given the Court's finding that Plaintiffs' claims are ripe,[3] the Court need not resolve the issue of mootness at this time. Ford's motion to dismiss the FAC under the prudential ripeness doctrine is DENIED.

### B. Plaintiffs Have Standing to Bring Claims on Behalf of Purchasers of the Ford Fiesta and Ford Focus.

Ford also seeks dismissal of Plaintiffs' claims regarding the Ford Fiesta and Ford Focus on grounds that "Plaintiffs lack standing to bring claims about products they did not actually buy." D.I. 24 at 9. For the following reasons, the Court finds that the named Plaintiffs, despite not purchasing either model, have standing to bring product defect claims on behalf of purchasers of the Ford Fiesta and Ford Focus.

In any litigation, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S. Ct. 2190, 2208, 210 L. Ed. 2d 568 (2021). "In the context of a class action, Article III must be satisfied by at least one named plaintiff." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 358–59 (3d Cir. 2015). In such circumstances, standing requires a concrete and particularized injury-in-fact. *Id.* at 359. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016) (citation omitted). Thus, named class action plaintiffs "must allege and show that they personally have been injured, not that injury has been

---

[3] The Court recognizes that Ford "reserve[d] the right to move to dismiss or for judgment on mootness grounds to the extent the court does not dismiss on ripeness grounds." D.I. 24 at n. 4. Ford devoted its briefing to arguing for dismissal on grounds that Plaintiffs' claims are not prudentially ripe. D.I. 24 at 7-9.

suffered by other, unidentified members of the class to which they belong and which they purport

to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks and citation

omitted).

Here, Ford contends that the named Plaintiffs lack standing to bring claims on behalf of

customers who purchased a Ford Fiesta or Ford Focus because none of the named Plaintiffs owned

or leased either model. D.I. 24 at 9. This Court considered an identical issue in *Maugain v. FCA*

*US LLC*, No. CV 22-116-GBW, 2023 WL 1796113 (D. Del. Feb. 7, 2023), where the named

plaintiffs pursued product defect claims against a vehicle manufacturer covering a group of class

vehicles, including some models that no named plaintiff had ever purchased. *Id.* at *5-6. The

defendant in *Maugain* sought to dismiss certain class claims on grounds that plaintiffs lacked

standing to pursue class claims about products they did not actually buy. *Id.* In denying the

defendant's motion, this Court highlighted the plaintiffs' complaint which alleged that "the Class

vehicles ha[d] the same [e]ngines in all material respects that suffer from the same [d]efect." *Id.*

at *6. While the Court recognized that the named plaintiffs brought defect claims for vehicles they

did not purchase, the Court found that the "[p]laintiffs' allegations stem[ming] from a defective

engine . . . [were] sufficient to show . . . that [p]laintiffs and other putative class members purchased

the same product, i.e., *the engine at issue*, as a component of their Class Vehicle," and the

plaintiffs argued that the Class Vehicles "suffered from the same defect."[4] *Id.* (emphasis added).

Thus, the Court held that the plaintiffs had standing to represent the putative class.

---

[4] While some courts require that a class action plaintiff pursue claims as to products that the
plaintiff actually purchased, others have "refused to dismiss claims for products that the named
plaintiffs did not buy themselves" if (1) plaintiffs " 'sufficiently allege that the basis for the claims
is the same'"; (2) "the Court finds that the products are closely related' "; and (3) the defendant
is the same for both products. *Maugain*, 2023 WL 1796113, at n. 3; *Cox v. Chrysler Grp., LLC*,
2015 WL 5771400, at *15 (D.N.J. Sept. 30, 2015) (citation omitted). As this Court noted in

Similarly, in this matter, Plaintiffs allege that all putative class members purchased or leased a vehicle with the same engine, Ford's 1.0L EcoBoost Engine. D.I. 15, ¶ 3. Plaintiffs also allege that each engine suffered from the same oil pump defects "which cause the oil pump belt to disintegrate or wear as well as cause the tensioners to break apart" and ultimately result in engine failure. *Id.*, ¶ 252. When accepted as true, these allegations establish that the Class Members, including those members who bought or leased a Ford Fiesta or Ford Focus, purchased the same product, i.e., the 1.0L EcoBoost Engine. Thus, at this time, the Court finds that the named Plaintiffs have standing to bring claims involving the Ford Fiesta and Ford Focus. Of course, Plaintiffs have an ongoing obligation to maintain standing for the entirety of the case, and Ford will have an opportunity to raise relevant differences within the proposed class at the class certification stage. For now, Plaintiffs may continue pursuing claims on behalf of all alleged Class Members, and Ford's motion to dismiss Plaintiffs' claims against the Ford Fiesta and Ford Focus for lack of standing is DENIED.

## C. The FAC Adequately Alleges that Ford's 1.0L EcoBoost Engines Contain a Defect.

Ford contends that Plaintiffs' claims must be dismissed for the additional reason that "[a]ll of Plaintiffs' claims rest on the assumption that there is in fact a defect." D.I. 24 at 10-11. Yet, according to Ford, Plaintiffs failed to adequately plead "precisely what is wrong." *Id.* Again, the Court disagrees.

Rule 8(a) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." To satisfy this rule, Plaintiffs' pleadings "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

*Maugain*, however, this split in authority is not relevant where, as here, "Plaintiffs allege that they purchased the same engine." *Maugain*, 2023 WL 1796113, at n. 3.

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). However, "[t]he allegations in the complaint must not be 'so undeveloped that [they do] not provide a defendant the type of notice of claim which is contemplated by Rule 8.'" *Tucker v. (HP) Hewlett Packard, Inc.*, 689 F. App'x 133, 134–35 (3d Cir. 2017) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)). To allege a design or manufacturing defect, a plaintiff need not "plead the mechanical details" of the defect. *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1237 n. 60 (C.D. Cal. 2011). Rather, courts typically require that a plaintiff allege enough facts to "give Defendant sufficient notice to defend against their claims." *DeCoteau v. FCA US LLC*, No. 215CV00020MCEEFB, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015). The FAC satisfies these pleading standards.

The Court finds *Hardt v. Chrysler Grp. LLC*, 2015 WL 12683965 (C.D. Cal. June 15, 2015), to be illustrative. In *Hardt*, plaintiffs alleged that certain Chrysler vehicles had manual transmissions with "one or more design and/or manufacturing defects." *Id.* at *1. The plaintiffs in *Hardt* supplemented their description of the alleged manual transmission defects "with a description of the symptoms of the alleged defect, including the clutch pedal falling to the floor and remaining depressed, as well as the clutch, transmission and gear shift burning out, the transmission failing to engage or disengage, and the vehicle's subsequent failure to accelerate or decelerate . . . ." *Id.* at *5. In finding that plaintiffs provided Chrysler sufficient notice of the defects at issue, the court noted that the plaintiffs' "description of the symptoms sufficiently set forth the specific facts on which [p]laintiffs base their belief that there is a defect." *Id.*; *see also Milisits v. FCA US LLC*, No. 20-CV-11578, 2021 WL 3145704, at *3 (E.D. Mich. July 26, 2021) (finding that a defect is sufficiently pled where the plaintiffs "identif[ied] the part of the Class

Vehicles they believe is defective" and "identif[ied] examples of how the defect allegedly manifests").

Here, the FAC asserts that members of the class suffered damages due to a defect in Ford's 1.0L EcoBoost engine "that prevents oil from circulating properly" and ultimately "destroys the engine, leaving customers with a repair bill that frequently exceeds the value of the vehicle." D.I. 15, ¶ 6. Like the plaintiffs in *Hardt*, Plaintiffs here describe the Defect by identifying some of its symptoms. According to Plaintiffs, "the 1.0L EcoBoost engines have manufacturing, workmanship, materials, and/or design defects which lead to a loss of oil pressure and an oil pump failure, causing the oil in the vehicle to slow or stop circulating, increasing engine temperature beyond specifications, and subsequently, causing the engine to seize." *Id.*

In addition to noting symptoms caused by the Defect, Plaintiffs allege that the Defect results from one or both of the following problems: "(1) defective engine oil pump belt tensioners, which are prone to premature failure and do not meet industry or manufacturer standards; and (2) Ford's use of insufficiently robust materials for the belts . . . ." *Id.* As support, the FAC explains that "[o]il pumps in automobiles are either belt-driven or chain-driven." *Id.*, ¶ 246. According to the FAC, "[b]elt-driven systems utilize belt tensioners to keep the belt at the correct tension level." *Id.*, ¶ 247. If, however, "the belt is too tight or too loose, it can cause premature wear on the belt" which "can cause the oil pressure to drop and eventually for the belt to stop pushing the oil back into the system. *Id.* Moreover, the wear on the belt can cause pieces of the belt to break off and begin to circulate in the oil, damaging other engine components and leading to a loss of motive power." *Id.* The FAC explains that, [t]raditionally, belt-driven systems utilize a dry belt in which the system is designed in such a way that the belt does not touch the oil . . . because oil can degrade the rubber over time." *Id.*, ¶ 249. Yet, the FAC alleges that Ford, "in a quest to make engines

smaller, quieter, and more fuel efficient," altered its belt-driven system and began using a wet belt or belt-in-oil design wherein "the belt actually sits inside the oil pump and is in direct contact with the engine oil." *Id.*, ¶ 250. The FAC concludes that it was this change in design which caused Ford to manufacture 1.0 EcoBoost engines that suffer from either "1) defective oil defective oil pump belt tensioners which do not hold the belt at the sufficient tension for the belt to operate properly and can fall apart, resulting in debris of belt tensioners in the oil pump; and/or 2) . . . an improper material in the belt (whether by design or by the installation of a belt which has not been made properly according to the specifications of Ford's design)." *Id.*, ¶ 252.

In contending that the FAC pleads sufficient support for the alleged Defect, Plaintiffs claim that, by identifying the "two specific causes" of the Defect, they have alleged "more than enough to give Ford notice of the Defect being alleged." D.I. 25 at 16. Additionally, Plaintiffs note that Ford, in its recall report filed with NHTSA, "describe[d] the defect in almost the exact same terms: '[1] The engine oil pump drive belt tensioner arm may fracture ... and/or [2] the oil pump drive belt material may degrade . . . .'" *Id.* at 13. In light of the allegations noted above and Ford's recall report, the Court agrees that Plaintiffs adequately "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [their] claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). While Plaintiffs have yet to identify the "specific problem parts" causing the engine oil pump to fail, Rule 8(a) does not require Plaintiffs to provide such detail at this early stage since "[d]iscovery is [likely] necessary to determine the nature of the underlying [] defect." *In re Subaru Battery Drain Prod. Liab. Litig.*, No. 1:20-CV-03095-JHR-JS, 2021 WL 1207791, at *12 (D.N.J. Mar. 31, 2021); *see also Milisits*, 2021 WL 3145704, at *3 ("[I]t is 'unsurprising[ ],' and not fatal, that Plaintiffs would not 'understand fully the root cause of the ...

malfunctions' before discovery has even started"). Accordingly, Ford's Motion to Dismiss on the grounds that Plaintiffs failed to plead a defect is DENIED.

### D. Plaintiffs Adequately Plead Fraud Under Rules 8(a) and 9(b).

As to Plaintiffs' fraud allegations, Ford contends that Plaintiffs failed to plead sufficient facts to meet the heightened pleading standards of Rule 9(b). D.I. 24 at 13-14. In alleging fraudulent misrepresentation, for instance, Ford contends that "Plaintiffs [] failed to allege the defect with any particularity." *Id.* As to Plaintiffs fraudulent omissions claims, Ford contends that "Plaintiffs fail to say what Ford should have warned them about, how that warning should have been made, what precisely it should have said, or how and why the warning would have affected their purchase decisions." *Id.* at 14. For the following reasons, the Court disagrees and finds that Plaintiffs' fraud allegations satisfy both Rules 8(a) and 9(b).

To plead affirmative misrepresentations, Plaintiffs must allege that Ford made false statements with capacity to deceive a reasonable consumer. *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Under Rule 9(b), a party asserting a fraud claim must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must allege "the who, what, when, where, and how of the events at issue." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (internal citations omitted). However, "the requirement of particularity does not require an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F.Supp.2d 369, 373 (D. Del. 2003) (internal citation and quotation omitted).

Here, the FAC pleads sufficient facts to support Plaintiffs' fraudulent misrepresentation claims by alleging that "Ford knew that the Class Vehicles suffered from an inherent Oil Pump Defect, were defectively designed and/or manufactured and were not suitable for their intended use" and "concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members" to purchase or lease the defective Class Vehicles. D.I. 15, ¶¶ 319, 738. Moreover, the FAC provides the "who, what, and when" to satisfy Rule 9(b) by citing specific advertisements and brochures in which Ford touted the "drivability and efficiency" of its 1.0L EcoBoost engines.[5] *See e.g., id.*, ¶ 222 ("Ford advertises and emphasizes the engineering of the 1.0L EcoBoost in the Class Vehicles, continually referring to the engine as 'an impressive combination of driveability and fuel efficiency.' In fact, "driveability and efficiency" is Ford's constant refrain in describing the functionality of the 1.0L EcoBoost . . . ."). Plaintiffs describe "how" the Defect made the Class Vehicles undrivable by explaining that the purpose of the oil pump "is to provide lubrication in order to reduce friction and wear on moving parts of a vehicle's engine." *Id.*, ¶ 242. Thus, when "there is insufficient oil or oil pressure" due to a defect in the oil pump, "the engine will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance (i.e. loss of power), and/or catastrophic engine failure when damaged moving parts cease to be able to move." *Id.*, ¶ 243; *see also id.* ("Insufficient oil can also result in engine stalling or seizing while the vehicle is in use," thus making the vehicle undrivable). Taken together, these allegations are sufficient to

---

[5] *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826, 834 (D.N.J. 2013) (finding that Rule 9(b)'s heightened standard is met where plaintiff "points to specific marketing and advertising materials and specific language in the Maintenance Program and Warranty that would lead reasonable consumers" to be deceived).

support Plaintiffs' claims that Ford made fraudulent misrepresentations to induce customers to purchase the Class Vehicles.

Additionally, Plaintiffs allege sufficient facts to support their fraudulent omissions allegations. While omission claims are also subject to Rule 9(b)'s particularity requirements, the pleading standard is relaxed for fraudulent omissions because "a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Robinson v. Gen. Motors LLC*, No. CV 20-663-RGA-SRF, 2021 WL 3036353, at *4 (D. Del. July 19, 2021), *report and recommendation adopted*, No. 1:20-CV-00663, 2021 WL 7209365 (D. Del. Nov. 30, 2021) (internal citations omitted); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 13, cmt. d (2020) (requiring only (1) "that the fact at issue was basic to the transaction[,]" (2) "a legitimate reason to rely on" the entity that failed to disclose, and (3) that the claimant could not have discovered the issue). Moreover, in product liability cases, courts typically assume that the omitted information was material to the plaintiff's decision to purchase the product if the "[a]lleged defects [] create[s] 'unreasonable safety risks[.]'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

Thus, in *Robinson*, the court found that the plaintiff "accomplished the purpose of the heightened pleading set forth in Rule 9(b)" where the plaintiff "explain[ed] how [the defendant]'s failure to disclose the Defect was misleading because [the defendant] advertised the [defective infotainment system] as a driver safety feature notwithstanding that the Defect caused distracted driving and backup camera failure." *Robinson*, 2021 WL 3036353, at *5. According to the *Robinson* court, the plaintiff's allegations were sufficient "to place the defendant on notice of the precise misconduct with which it is charged." *Id.* (internal citations omitted).

Similarly, here, Plaintiffs allege that Ford omitted any mention of the Oil Pump Defect from customers. D.I. 15, ¶ 259. This Defect, according to Plaintiffs, not only altered the drivability of the Class Vehicles, *see supra* at 18-19, but also "cause[d] unsafe conditions," including the sudden loss of forward propulsion or stalling" and "severely affect[ed] the driver's ability to control the car's speed, acceleration, and deceleration." D.I. 15, ¶ 254. Plaintiffs assert that "Ford knew about the Defect present in every Class Vehicle, along with the attendant safety problems, and concealed this information from Plaintiffs and Class Members . . . ." *Id.*, ¶ 259. Plaintiffs further claim that, "[i]f Plaintiffs and Class Members had known about the Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them." *Id.*, ¶ 260.

Because Plaintiffs allege that the Defect caused safety concerns, the Court will assume that Ford's omission was material to each Class Member's decision to purchase their respective vehicles. Further, given Plaintiffs' claims that Ford had superior and exclusive knowledge of the Oil Pump Defect, D.I. 15, ¶ 318, the Court finds Plaintiffs' allegations sufficient to support their fraud-by-omissions claims. *Robinson*, 2021 WL 3036353, at *4.

Accordingly, Ford's Motion to Dismiss Plaintiffs' fraud-based misrepresentation and omissions claims is DENIED.

### E. Plaintiffs Adequately Allege That Ford Had Pre-Sale Knowledge of the Defect.

Ford contends that Plaintiffs' fraud claims should be dismissed for the additional reason that Plaintiffs failed to plead that Ford had pre-sale knowledge of the Defect before it sold Class Vehicles to certain Plaintiffs in 2018. D.I. 24 at 14. Plaintiffs respond that Ford's pre-sale knowledge can be inferred from Plaintiffs' allegations that Ford: (1) released a Technical Service Bulletin ("TSB") in 2019 alluding to the Defect; (2) received various complaints customers

submitted to NHTSA regarding the 1.0L EcoBoost engine; and (3) conducted internal testing and research. Ford contends that none of Plaintiffs' allegations are sufficient to impute pre-sale knowledge to Ford. D.I. 25 at 21-22. For the following reasons, the Court agrees with Plaintiffs that their allegations, taken in concert, are sufficient to impute pre-sale knowledge to Ford.

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987).

With respect to the TSBs, Ford contends that the earliest TSB was issued in 2019, months after some of the named Plaintiffs purchased their defective vehicles. D.I. 24 at 15. While the Court recognizes that some Plaintiffs purchased vehicles before Ford issued the 2019 TSB,[6] this fact alone does not defeat Plaintiffs' claims that the 2019 TSB evidences Ford's pre-sale knowledge. Indeed, courts have recognized that "TSBs issued post-sale [may] support an inference of the seller's pre-sale knowledge of a defect." *Robinson*, 2021 WL 3036353, at *6; *Parrish v. Volkswagen Grp. of Am., Inc.*, 463 F. Supp. 3d 1043, 1058 (C.D. Cal. 2020). In *Parrish*, the court explained that post-sale TSBs may evidence pre-sale knowledge "[b]ecause a manufacturer must receive complaints or data raising an issue and then must investigate the issue before issuing a [] [] TSB." 463 F. Supp. 3d at 1058. Because this process can span several months, the *Parrish* court found it "reasonable to infer that manufacturers know of the issue prior to the release of the [] [] TSB." *Id.* The Court agrees with the *Parrish* court's reasoning and finds that TSBs issued post-sale *may* provide evidence of a manufacturer's pre-sale knowledge.

---

[6] D.I. 15, ¶¶ 17, 24.

Nonetheless, the window of time between the sale and the date in which the TSB is issued must be reasonable, and "a TSB issued long after purchase lends little support to the necessary inference of knowledge." *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1094 (N.D. Cal. 2014). In *MacDonald*, the district court found plaintiff's allegations of pre-sale knowledge plausible where the "TSB[s] were issued only five and nine months after the last relevant purchase in this case, and less than two years after the first purchase." *Id.*; *see also Parrish*, 463 F. Supp. 3d 1058 (finding "a five-month period between knowledge of the Defect and release of the TT to be plausible at this stage"). Similarly, here, the FAC asserts that the earliest purchases by a named Plaintiff were made in September 2018, roughly nine months before Ford filed its first TSB, and the latest purchase by a named Plaintiff occurred on or about January 12, 2021, several years after the first TSB. D.I. 15, ¶¶ 17, 199, 290. Given the high probability that the TSB followed months of research and investigation by Ford, the Court finds that Plaintiffs can rely on the post-sale TSBs as evidence of Ford's pre-sale knowledge of the Defect.

Ford also contends that the 2019 TSB cannot impute pre-sale knowledge on Ford because "[n]othing about the TSB implies that it was related to the defect Plaintiffs allege . . . ." D.I. 26 at 8. The FAC alleges that, "[b]eginning in 2019, Ford began issuing multiple TSBs to address the defects in their in the oil pump in 1.0 EcoBoost Engines." D.I. 15, ¶ 289. According to Plaintiffs, the first TSB, issued on July 22, 2019, "warns that 2018-2019 Ford EcoSport vehicles with the 1.0 EcoBoost engine 'may exhibit a loss of engine oil pressure with an illuminated oil pressure warning lamp. This may be due to a broken/failed engine oil pump belt tensioner which leads to a loss of engine oil pressure. Due to the nature of this failure, an engine replacement may be required.'" *Id.*, ¶ 290. Plaintiffs allege that later TSBs "expanded the vehicles affected by the oil pump defect" and "described the vehicles 'may exhibit an illuminated oil pressure warning lamp

with a loss of engine oil pressure[] . . . [that] may be due to a failed engine oil pump belt tensioner which leads to a loss of engine oil pressure." *Id.*, ¶ 291.  Construing these allegations in favor of Plaintiffs, the Court finds that the TSBs sufficiently relate to the oil pump Defect alleged in the FAC, which Plaintiffs allege caused a loss of oil pump pressure and defects in the function of the oil pump belt tensioner. *Id.*, ¶ 254.

As to the NHTSA complaints, Ford contends that the NHTSA complaints do not impute pre-sale knowledge onto Ford because "most of the[] [complaints] post-date Plaintiffs' purchases." Plaintiffs, however, highlight multiple complaints that pre-date the earliest alleged sales in 2018. *See* D.I. 15, ¶ 276 (asserting a complaint from October 2017 which noted that "[t]he oil pump is belt driven aka wet belt and the rubber teeth come off stopping up the oil pump and causing it not to work properly" and another complaint from April 2017 noting engine failure necessitating engine replacement).  While the Court agrees with Ford that "two or three presale complaints" are typically insufficient to infer pre-knowledge, in this case, the Court cannot view the complaints independently from Plaintiffs' remaining allegations regarding Ford's pre-sale knowledge.  D.I. 24 at 15.  Rather, at the pleading stage, "courts must consider the complaint in its entirety and determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim." *See Robinson*, 2021 WL 3036353, at *7 (finding pre-sale knowledge based on based on GM's TSBs, consumer complaints and GM's responses thereto, and GM's aggregated internal data, '[t]aken in ... totality'") (internal citations omitted).  Thus, here, the two NHTSA complaints that were submitted before the Plaintiffs' purchase must be viewed alongside Ford's 2019 TSB.  When viewed together, the complaints and TSB adequately support Plaintiffs' claims that Ford had pre-sale knowledge of the Defect.

Plaintiffs' allegations regarding Ford's internal testing, including pre-release testing data, must be viewed in the same manner. While Plaintiffs do not allege facts showing that internal testing *actually alerted* Ford to the Defect, Plaintiffs do not rely on "allegations that testing merely occurred" alone. Rather, Plaintiffs raise these allegations together with the TSBs and NHTSA complaints, each of which lend support to Plaintiffs' claims that testing likely alerted Ford to the Defect. Indeed, as the Court already noted, the 2019 TSB likely followed several months of testing and analysis by Ford. *See supra* at 21-22; *see also Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626, at \*18 (D.N.J. Oct. 9, 2013). Similarly, it is reasonable to assume that NHTSA complaints, although smaller in number, would lead Ford to conduct some research into defects with their 1.0 EcoBoost engines. D.I. 15, ¶ 283 (asserting that "[t]he testing Ford would have done in response to [NHTSA] complaints would have also confirmed the Oil Pump Defect"). When viewed together, the TSBs, NHTSA complaints, and testing allegations are adequate to establish pre-sale knowledge at this stage of the litigation. Accordingly, Ford's Motion to Dismiss Plaintiffs' fraud claims on grounds that Plaintiffs failed to plead pre-sale knowledge is DENIED.

### F. Plaintiffs Cannot Bring Express Warranty Claims Against Ford.

Ford moves the Court to dismiss Plaintiffs' express warranty claims "because none of them experienced the alleged defect and presented their vehicle to Ford for repairs during the warranty period." D.I. 24 at 16. As discussed below, the Court finds that the FAC only alleges that one named Plaintiff, Plaintiff Bilotta, presented her vehicle to Ford before the expiration of the vehicle's 60,000-mile warranty. Because Plaintiffs do not allege that the other named Plaintiffs sought repairs during their respective warranty periods, the remaining named Plaintiffs cannot pursue express warranty claims against Ford.

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992). Thus, generally, "an express warranty does not cover repairs made after the applicable time ... ha[s] elapsed." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 616 (3d Cir. 1995) (alteration in original) (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir.1986)) (rejecting the argument that a warranty claim could be asserted for defects that were not discovered until after the warranty period). Courts in this circuit have applied this rule "regardless of whether the defect existed prior to the expiration of the warranty." *Alban v. BMW of N. Am., LLC*, No. 09-5398, 2010 WL 3636253, at *6 (D.N.J. Sept. 8, 2010).

Here, Plaintiffs concede that a 60,0000-mile warranty applied to the vehicles purchased by the named Plaintiffs. D.I. 15, ¶ 237. Plaintiffs also concede that "Plaintiff Ptaszaek paid $6,270 plus towing because her engine failed 705 miles outside the warranty term; [] Plaintiff Maldonado's engine failed at 65,000 miles; . . .Plaintiff Wright's failed at 62,000 miles; . . Plaintiff Allard's oil pressure light illuminated around 60,000 miles; . . . Plaintiff Martin's failed at 65,000 miles; . . . Plaintiff Drotos' engine failed at 65,000 miles . . . ." D.I. 25 at 23. The FAC notes, however, that Ford's warranty required the vehicle to be "presented" to an authorized Ford Motor Company dealer "within the time and mileage limitations of the warranty drafted by Ford" in order for "replacement of the oil pump or any component damaged by the Oil Pump Defect [to] be covered under the warranty for manufacturing and workmanship defects." D.I. 15, ¶ 240. Because the FAC does not allege that Plaintiffs Ptaszaek, Maldonado, Wright, Allard, and Dortos sought repairs during their respective warranty periods, their breach of express warranty claims must be dismissed. *See Robinson*, 2021 WL 3036353, at *16 (dismissing express warranty claims despite plaintiffs' allegations "that the defendant knew a defect covered under

the warranty was present at the time of sale" because "the warranty at issue required the vehicle owner to 'take the vehicle to a ... dealer facility within the warranty period and request the needed repairs,'" which certain plaintiffs failed to do).

As to Plaintiff Bilotta, the FAC alleges that Bilotta's powertrain warning light began illuminating at 56,000. D.I. 15, ¶ 56. The FAC further notes that Bilotta "brought her car into Chapman Ford[,] [and] [h]er dealership ran a diagnostic and did not find any Diagnostic Trouble Codes indicating that the engine's control module recorded a problem." *Id.*, ¶ 57. According to the FAC, "[t]he dealership concluded that there was nothing they could do until something else was to happen as result of the warning light going off." *Id.* Subsequently, when Bilotta's vehicle reached 64,000 miles, "the oil pressure light illuminated on her dashboard" and "service technicians at the [same] dealership examined the engine and found debris within the engine from the deteriorated oil pump belt, as well as metal shavings resulting from metal-on-metal damage due to insufficient oil circulation within the engine." *Id.*, ¶¶ 58-59. Because Bilotta was now outside of the 60,000-warranty period, the FAC alleges that the dealership refused to cover the cost of an engine replacement, forcing Bilotta to purchase a new engine on her own. *Id.*, ¶ 61. Plaintiffs emphasizes that Ford issued TSBs indicating that vehicles "may exhibit an illuminated oil pressure warning lamp" and directing engine replacement be performed. However, Bilotta has not alleged that the oil pressure warning lamp illuminated within the 60,000-mile warranty period, nor that the engine failed within the warranty period. Bilotta's allegations are insufficient to support a claim that Ford breached the express terms of its warranty. *Cf. Robinson v. Gen. Motors, LLC*, No. 1:20-CV-00663, 2022 WL 19384806, at *3 (D. Del. Dec. 5, 2022) (dismissing all but one named plaintiffs' breach of express warranty claim where "plaintiffs [] amend[ed] [the one plaintiff's] express warranty claim by stating that her

vehicle 'had less than 50,000 miles on the odometer,' when the dealership first told her the

Defect was not covered under warranty"); *Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558

(D.N.J. 2012) (noting that "Plaintiffs allege that they experienced symptoms of the alleged []

defect prior to the expiration of the warranty.").

Plaintiffs contend that their claims should survive because Ford's warranties were

unconscionable. D.I. 25 at 24. However, "[t]here is nothing substantively unconscionable or

unreasonable about a 5 year/60,000 mile warranty." *Nelson*, 894 F. Supp. 2d at 566. Moreover,

Ford's "alleged knowledge of a[n engine] defect is an insufficient basis on which to find the

warranty limit unconscionable." *Id.* at 567. While Plaintiffs cite *Skeen v. BMW of N. Am., LLC*,

2014 WL 283628, at *14 (D.N.J. Jan. 24, 2014), for the proposition that the durational limits

were unconscionable, *Skeen* is distinguishable from this case because the plaintiffs in *Skeen*

alleged not only that the defendant affirmatively and intentionally misled the plaintiffs into

delaying repairs until after the warranty expired, but also that they experienced symptoms during

the warranty period. *Id.* at *15. At this time, no named plaintiff has pled facts to support similar

inferences here.

Accordingly, Ford's motion to dismiss the breach of express warranty claim is

GRANTED WITHOUT PREJUDICE.

### G. Ford's Motion to Dismiss Plaintiffs' State Consumer Protection Claims is Granted-In-Part and Denied-In-Part.

The FAC asserts several state consumer protection claims against Ford, including claims

under the laws of Michigan (Counts X-XI), North Carolina (Counts XII-XIII), Pennsylvania

(Counts XIV-XVI), Texas (Counts XVIII-XIX), and Tennessee (Count XV). Ford moves to

dismiss the following state law claims:

### i. **Michigan Consumer Protection Act**

Ford contends that the claims brought by Plaintiffs Ptaszek and Drotos under the Michigan Consumer Protection Act ("Michigan CPA") fail because the Michigan CPA does not apply to claims that involve the "manufacture, sale, and lease of automobiles." D.I. 24 at 17-18. Specifically, Ford contends that, pursuant to a Michigan Court of Appeals decision in *Cyr v. Ford Motor Co.*, 2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019), "the manufacture, sale, and lease of automobiles, and the provision of express and implied warranties concerning those automobiles and their components are all conduct that is 'specifically authorized' under federal and state law" and are thus exempt from Michigan CPA claims. *Id.* (citing *Cyr*, 2019 WL 7206100, at *2 (unpublished)).

According to Ford, following the Michigan Court of Appeals' *Cyr* decision, Michigan courts have "routinely dismissed CPA claims against automotive manufacturers" on grounds that such claims are exempt under *Cyr*. *Id.* Ford contends that the Court should find the same here. *Id.* Plaintiffs disagree and note one case, *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659 (E.D. Mich. 2020), in which a federal court in Michigan declined to dismiss claims brought against a vehicle manufacturer under the Michigan CPA. D.I. 25 at 25. However, the court in *Francis* explained that its holding was due in large part to defendant's failure to cite any authority establishing that the statutory exemption for car sales in Michigan applied to the Michigan CPA claim pending before the court. *Francis*, 504 F. Supp. 3d at 690–91 ("GM asserts this position without elaboration, and it merely posits, without citing any statutory authority, that car sales in Michigan 'are "specifically authorized under" the Michigan Vehicle code.'").

This matter is distinguishable from *Francis*, however, because Ford has cited recent authority in support of its claim that Plaintiffs' Michigan CPA claims are likely exempt from the

statute. D.I. 24 at 17-18; *see also Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707, 719-20 (E.D.

Mich. 2021); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 275-76 (E.D. Mich. 2021)

("Ford's manufacture, sale, and lease of cars, and its provision of warranties for those cars, was

specifically authorized under state and federal law…"); *Chapman v. Gen. Motors LLC*, 531 F.

Supp. 3d 1257, 1301-02 (E.D. Mich. 2021) ("Michigan's Consumer Protection Act ('MCPA')

contains a broad exception: it does not apply to any transactions or conduct 'specifically authorized

under laws administered by a regulatory board or officer acting under statutory authority of this

state or the United States.'") (internal citations omitted); *Browning v. Am. Honda Motor Co.*, 549

F. Supp. 3d 996, 1013 (N.C. Cal. 2021) ("Regarding the claim by Mr. and Mrs. Wescott under the

Michigan Consumer Protection Act ('MCPA'), the Court agrees with Defendants that claims

related to 'the manufacture, sale, and lease of automobiles" cannot form the basis for a claim under

the MCPA.'") (internal citations omitted).

In *Gregorio*, the court explicitly found that the defendant's motor vehicle sales to plaintiffs

were exempt from the Michigan CPA "[b]ased on the Michigan Court of Appeals' current

interpretation of the MCPA, and that of courts in [Michigan]." *Gregorio*, 522 F. Supp. 3d at 276.

The court in *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 970 (E.D. Mich. 2022),

similarly explained that, "[w]ith respect to Michigan's MCPA, . . . vehicle sales are exempted from

the law." The *In re Chevrolet* court added that the Michigan Supreme Court declined to hear *Cyr*

on appeal and explained that, "unless and until the Michigan Supreme Court revisits the issue, this

Court may not interpret Michigan law in a manner contrary to the decisions of Michigan's highest

court." *Id.* Recent courts have continued dismissing Michigan CPA claims under similar grounds.

*Miller v. Ford Motor Co.*, No. 220CV01796DADCKD, 2024 WL 1344597, at *45 (E.D. Cal. Mar.

29, 2024) (noting "the plethora of decisions in which courts have dismissed such MCPA claims in vehicle defect cases").

Given the above, the Court is persuaded that claims brought against car manufacturers like Ford are exempt from the Michigan CPA under controlling Michigan precedent. Thus, Ford's motion to dismiss Plaintiffs Ptaszek and Drotos' Michigan CPA claims is GRANTED. The Michigan CPA claims are DISMISSED with prejudice.

### ii. **Texas Deceptive Trade Practices-Consumer Protection Act**

Additionally, Ford contends that Plaintiffs' claims under the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPA") must be dismissed because Plaintiffs failed to plead that they actually relied on the alleged omission. D.I. 24 at 18-19.

According to Ford, the TDTPA requires that "a plaintiff must prove actual reliance." *Id.* at 18 (citing *Tershakovec v. Ford Motor Co., Inc.*, 2023 WL 4377585, at *7 (11th Cir. July 7, 2023)). Because the TDTPA requires actual reliance to be proven as to each individual plaintiff, Ford notes that claims under the TDTPA are "inappropriate for class treatment." *Id.* at 19 (citing *Tershakovec*, 2023 WL 4377585, at *7).

The Court is persuaded that Texas courts typically do not certify class claims brought pursuant to the TDTPA. In *Fid. & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416, 423 (Tex. App. 2005), a Texas appeals court explained that class actions under the TDTPA are "near impossibility[ies]" because the statute requires evidence of reliance. According to the *Pina* court, to prove reliance under the TDTPA, "it is not enough to demonstrate that a defendant wanted purchasers to rely on its misrepresentations in choosing or staying with a particular product; instead there must be evidence that the purchasers actually did rely on the misrepresentations." *Id.* And "[d]espite [claims] that [a] misrepresentation clearly occurred and the purchases were then

made by all class members," a class will not be certified unless it also shows "that every purchaser relied on the misrepresentation in making the purchase." *Id.* at 424. According to the *Pina* court, "there is yet to be a case . . . in Texas . . . that has encountered a situation in which class-wide proof of reliance could be found." *Id.* at 425.

Still, the court in *Pina* explained that the TDTPA does not "entirely preclude class actions." *Id.* at 423. Thus, although no Texas court has certified a class bringing claims pursuant to the TDTPA, the Court cannot find, as a matter of law, that Plaintiffs would not prove that each Class Member[7] actually relied on Ford's alleged omissions at the class certification stage. *Davis v. D.R. Horton Inc.*, No. CV 19-1686-MN-JLH, 2020 WL 1244848, at *5 (D. Del. Mar. 16, 2020), *report and recommendation adopted*, No. CV 19-1686-LPS-JLH, 2020 WL 6042091 (D. Del. Oct. 13, 2020) (citing *P.V. v. School District of Philadelphia*, 2011 WL 5127850 (E.D. Pa. Oct. 31, 2011) (noting that "[c]ourts have good reason to decline to hastily strike class action allegations early in the litigation life cycle. Specifically, unless the parties have completed discovery and at least one party has moved for class certification, a court very rarely has the information necessary to conduct the 'rigorous analysis' inherent in the class certification decision").

Because Ford has given no other grounds for dismissal, Ford's motion to dismiss Plaintiffs' TDTPA claims is DENIED.

### iii. **Florida's Deceptive and Unfair Trade Practices Act**

Ford contends that Plaintiffs Wright and Martins' Florida implied warranty claims must be dismissed because Florida law requires parties raising implied warranty claims to show direct contractual privity. D.I. 24 at 19; *Hicks v. Bombardier Recreational Prod. Inc.*, 2023 WL

---

[7] Or, alternatively, a valid subclass thereof.

4763194, at *14 (S.D. Fla. July 26, 2023) ("The Florida Supreme Court has held that implied-warranty claims require a contractual relationship to meet the privity requirement.").

Plaintiffs respond that the FAC establishes Plaintiffs Wright and Martins' privity with Ford by alleging that both Plaintiffs purchased their vehicles from authorized Ford dealers.  D.I. 25 at 27.  Because the dealers were authorized, Plaintiffs contend that the dealers were acting as Ford's agents.  According to Plaintiffs, under such circumstances "where a product's seller is alleged to be an agent of defendant," Eleventh Circuit precedent holds that "privity in implied warranty claims may be established through [the] agency [relationship]." *Id.* (citing *Glob. Quest, LLC. V. Horizon Yachts, Inc.*, 849 F.3d 1022, 1032 (11th Cir. 2017)).

Ford contends that Plaintiffs' agency claims fail to establish privity between it and Plaintiffs Wright and Martins as "recent automotive cases have held that a 'purchase from a dealership does not establish privity with a manufacturer.'"  D.I. 26 at 12 (citing *Nuwer v. FCA US, LLC*, 2023 WL 8724014, at *6 (S.D. Fla. Sept. 29, 2023), *modified on reconsideration*, 2023 WL 8698327 (S.D. Fla. Dec. 15, 2023)).  However, *Nuwer* does not support Ford's motion to dismiss.  Indeed, the *Nuwer* court explained that the question of whether an authorized dealer was an agent of the manufacturer required the court to engage in "a factual determination" and, according to the *Nuwer* court, the resolution of such a question "would be premature" at the pleadings stage. *Nuwer*, 2023 WL 8724014, at *7.  Thus, the *Nuwer* court noted its decision during the early stages of the case to deny the defendant's motion to dismiss because the "[p]laintiffs [] allege[d] in their Amended Complaint that the selling dealers were agents of [the defendant]." *Id.* (citing *Nuwer v. FCA US LLC*, 552 F. Supp. 3d 1344, 1363 (S.D. Fla. 2021)).  While the *Nuwer* court ultimately ruled in the defendant's favor by finding "no evidence in the record from which a jury could reasonably find the existence of an agency relationship between [the defendant] and the

[authorized] sellers under Florida law," the court explained that such a finding was appropriate "now [that] the case [was] at the summary judgment stage." *Id.* at *7.

Plaintiffs here, like the plaintiffs in *Nuwer*, allege an agency relationship between Ford and its "network of authorized dealerships." D.I. 15, ¶¶ 217, 308-315. At this stage, the Court must accept these allegations as true. Having done so, the Court cannot dismiss Plaintiffs' Florida implied warranty claims due to lack of "direct contractual privity." *Global Quest, LLC*, 849 F.3d at 1032. For this reason, Ford's motion to dismiss Plaintiffs Wright and Martin's implied warranty claims under Florida law is DENIED.

### iv. **Common Law Omission under California, Florida, and Tennessee Law**

According to Ford, courts in California, Florida, and Tennessee apply the economic loss rule, which "bar[s] a plaintiff's tort recovery of economic damages unless such damages are accompanied by some form of physical harm (i.e., personal injury or property damage)." D.I. 24 at 22 (citing *Barela v. FCA US, LLC*, 2022 WL 19333334, at *2 (C.D. Cal. Oct. 11, 2022)). Ford moves to dismiss Plaintiffs' common law omission claims under California, Florida, or Tennessee law on grounds that Plaintiffs allege no losses apart from economic ones related to their vehicles. *Id.* Thus, Ford contends that each claim is barred under the economic loss rule. *Id.*

While Plaintiffs do not dispute that courts in California, Florida, and Tennessee recognize the economic loss rule, Plaintiffs contend that their claims survive dismissal because "states in the relevant jurisdictions have [also] adopted exceptions to the [economic loss rule] where a party intentionally hides information about a defect or hides product safety concerns." D.I. 25 at 30. According to Plaintiffs, dismissal is not warranted because the FAC "properly plead[s] affirmative misrepresentation and omissions fraud claims" based on Ford's representations that the Class Vehicles contained engines that were "safe and reliable." *Id.* For the following reasons, the Court

cannot find that Plaintiffs' common law omission claims under California, Florida, or Tennessee law are barred by the economic loss rule at this time.

Under California common law, a plaintiff seeking economic losses "in actions arising from the sale or purchase of a defective product . . . must be able to demonstrate that either physical damage to property (other than the defective product itself) or personal injury accompanied such losses; if they cannot, then they would be precluded from any tort recovery in strict liability or negligence." *Ladore v. Sony Computer Entertainment America, LLC*, 75 F.Supp.3d 1065, 1075 (N.D. Cal. 2014). Thus, pursuant to the economic loss rule, "a plaintiff cannot assert tort claims based on a product not performing as promised—that is simply an economic loss recoverable in a contract-based action." *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, 483 F. Supp. 3d 838, 848 (C.D. Cal. 2020). California courts recognize a fraud exception to the economic loss rule, however, where a party alleges "fraud claims based on misrepresentations." *Id.* Whether this exception applies to claims alleging fraudulent concealment, however, "is unsettled." *See Milstead v. General Motors LLC*, No. 21-6338, 2023 WL 4410502, at *11 (N.D. Cal. July 6, 2023) (quoting *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1019 (N.D. Cal. 2020)). Recently, in *Rattagan v. Uber Techs., Inc.*, 19 F.4th 1188, 1190 (9th Cir. 2021), the Ninth Circuit certified this question to the California Supreme Court: *Id.* at 1193 (asking "[u]nder California law, [whether] claims for fraudulent concealment exempted from the economic loss rule"). The California Supreme Court subsequently granted the Ninth Circuit's request for certification, and the case is currently pending. *See id.*, *req. for certification granted*, No. S272113 (Cal. Feb. 9, 2022).[8]

---

[8] The California Supreme Court recently heard argument on *Rattagan* and submitted it for decision. *Id.*, No. S272113 (Cal. June 4, 2024). The California Supreme Court issues opinions within ninety

Because the scope of this exception is unsettled under California law, courts have declined

to "hold that the economic loss doctrine bars [a plaintiff's] concealment-based fraud claim as a

matter of law." *Jimenez v. Gen. Motors, LLC*, No. 223CV06991WLHJPRX, 2023 WL 6795274,

at *4 (C.D. Cal. Oct. 13, 2023). Given that Plaintiffs here pled fraud claims based on both alleged

misrepresentations and omissions by Ford, the Court similarly declines to find that Plaintiffs'

common law omission claims are barred under California's interpretation of the economic loss

rule. Thus, the Court DENIES Ford's motion with respect to common law omission under

California law without prejudice and will reconsider its ruling after the parties inform the Court

that the California Supreme Court has issued its ruling.

Florida likewise recognizes a limited fraud exception to the economic loss rule. Under the

Florida exception, "[c]laims for fraudulent inducement can sometimes survive the economic loss

rule ... in situations in which the plaintiff can show that the fraudulent inducement is extraneous to

the breach of contract." *Behrman v. Allstate Ins. Co.*, 388 F. Supp. 2d 1346, 1349 (S.D. Fla. 2005),

*aff'd* 178 F. App'x 862 (11th Cir. 2006) (citing *Medalie v. FSC Secs. Corp.*, 87 F. Supp. 2d 1295,

1305 (S.D. Fla. 2000)). In determining whether a fraudulent inducement claim is exempted from

the economic loss rule, "'[t]he court must determine if the alleged fraud is an act of performance

or in a term of the bargain.'" *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1303 (S.D.

Fla. 2009) (internal citations omitted). "If it is alleged that the fraud relates to the performance of

the agreement, then the economic loss rule will limit the parties to their contractual remedies.... If

the alleged fraud, however, '*relates to a misrepresentation which caused the plaintiff to enter*

*into the agreement*, then such fraud would be fraud in the inducement, which will not be barred

---

(90) days of submission. *See Frequently Asked Questions*, Supreme Cout of California,
https://supreme.courts.ca.gov/e-filing-procedures/frequently-asked-questions.

by the economic loss rule.'" *Id.* (emphasis added) (internal citations omitted). The elements for a fraudulent inducement claim under Florida law are: "(1) A misrepresentation of a material fact; (2) The representor of the misrepresentation, knew or should have known of the statement's falsity; (3) Intent by the representor that the representation will induce another to rely and act on it; and (4) Resulting injury to the party acting in justifiable reliance on the representation." *Lou Bachrodt Chevrolet, Inc. v. Savage*, 570 So. 2d 306, 308 (Fla. Dist. Ct. App. 1990).

Ford contends that Plaintiffs cannot rely on the Florida exception because Plaintiffs "do not claim to be pleading fraudulent inducement claims." D.I. 26 at 13-14. The Court disagrees. The FAC asserts that "Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon." D.I. 15, ¶ 738. The FAC adds that "Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment" by purchasing or leasing defective Class Vehicles. *Id.* Given these allegations, it is plausible that Plaintiffs' common law omission claims under Florida law are exempt from the economic loss rule. *Cf. Ford v. Hyundai Motor Am.*, No. 820CV00890FLAADSX, 2024 WL 891804, at *10 (C.D. Cal. Jan. 3, 2024) (dismissing clam under Florida claim under economic loss rule where the "[p]laintiff [] characterize[d] his claim as one for fraudulent inducement, [but] he d[id] not plead or identify any specific misrepresentations Defendants made to induce him to purchase a Class Vehicle").

Similarly, Tennessee, like Florida, recognizes an exception to the economic loss rule for claims alleging fraudulent inducement. *Oddello Indus., LLC v. Sherwin-Williams Co.*, No. 2:14-CV-127, 2015 WL 13404558, at *3 (E.D. Tenn. Mar. 31, 2015) (noting "that there is an exception to the rule for claims of fraud in the inducement and fraud"). To state a claim for fraudulent inducement under Tennessee law, "a plaintiff must allege the defendant: (1) made a false statement

concerning a fact material to the transaction; (2) with knowledge of the statement's falsity or utter disregard for its truth; (3) with the intent of inducing reliance on the statement; (4) the plaintiff reasonably relied on the statement; and (5) the reliance resulted in an injury." *Tractor Supply Co. v. ACE Am. Ins. Co.*, No. 3:21-CV-00619, 2022 WL 4823011, at n. 7 (M.D. Tenn. Sept. 30, 2022). For the same reasons discussed with respect to Plaintiffs' Florida claims, the Court finds that Plaintiffs assert sufficient allegations of fraudulent inducement. Thus, the Court cannot find that Plaintiffs' common law omissions claims fail as a matter of law under Tennessee or Florida law pursuant to the economic loss rule.

For the foregoing reasons, Ford's motion to dismiss Plaintiffs' common law omission claims under California, Florida, and/or Tennessee law is DENIED.

### H. Plaintiffs Ptaszek and Drotos Fail to State a Claim Under the Magnuson-Moss Warranty Act.

Ford moves to dismiss Plaintiff's claims under the Magnuson-Moss Warranty Act ("MMWA") on three grounds. First, Ford contends that the MMWA claims must be dismissed if Plaintiffs' express and implied warranty claims are dismissed by the Court. D.I. 24 at 23. Because the Court dismisses only some of Plaintiffs' state-law warranty claims, however, this argument does not support Ford's Motion to dismiss the MMWA claims.

Second, Ford alleges that dismissal of the MMWA claims is warranted because Plaintiff has failed to meet the statutory requirements of a "written warranty." D.I. 24 at 23. Because the Court has dismissed the express warranty claims, *see* Section III.A., *supra*, Plaintiffs' written warranty claims under the MMWA also fail. Because Ford does not contend that Plaintiffs have failed to meet the standard for implied warranty claims under the MMWA,[9] however, the Court

---

[9] D.I. 15, ¶ 719.

will assume that Plaintiffs have sufficiently pled the statutory standards of an implied warranty claim for purposes of resolving the pending motion. Because Plaintiffs Ptaszek and Drotos and the Michigan subclass were not included in Plaintiffs' implied warranty allegations, Plaintiffs' MMWA claims survive dismissal except as to the aforementioned parties.

Under its third ground for dismissal, Ford contends that Plaintiffs' MMWA claims fail because  claims brought under the statute must consist of at least one hundred members. D.I. 24 at 24; *see also* 28 U.S.C. § 1332(d)(2), (5)(B), (6). The Court agrees that Plaintiffs failed to satisfy this requirement and, consequently, finds that the Court lacks an independent basis for exercising subject matter jurisdiction over the MMWA claims. *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023). Still, this fact alone does not warrant dismissal of the MMWA claims, as the Court may exercise supplemental jurisdiction over the MMWA claims "where multiple [related] claims are being pursued in a single complaint . . . .". *Id.* at  183 n. 10; *Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, No. CV1713544WHWCLW, 2018 WL 4144683 (D.N.J. Aug. 29, 2018); D.I. 15, ¶ 13 (asserting supplemental jurisdiction).  Indeed, "[c]ourts routinely permit putative class actions with fewer than 100 named plaintiffs to proceed with MMWA claims where, as in this case, the court has jurisdiction under some other statute." *Kearney*, 2018 WL 4144683, at \*17.  Because Ford makes no arguments related to supplemental jurisdiction, the Court will not dismiss the MMWA claims on grounds that Plaintiffs do not satisfy the jurisdictional requirement of pleading a class of at least one hundred members.

Accordingly, Ford's motion to dismiss the MMWA claims is GRANTED without prejudice with respect to Plaintiffs Ptaszek,Drotos, and the Michigan subclass and DENIED as to all other Plaintiffs.

## I.  Plaintiffs' Claims Seeking Equitable Relief Must Be Dismissed.

Finally, Ford moves to dismiss Plaintiffs' claims for equitable relief, including their claims for unjust enrichment and California Unfair Competitions Law ("UCL") restitution, on grounds that Plaintiffs failed to plead that legal remedies would not adequately compensate any future injury.  D.I. 25 at 32.  The Court agrees that, in order to seek equitable relief from the Court, Plaintiffs must plead that there is no adequate remedy at law.  Indeed, a party has "no right to equitable relief or an equitable remedy when there is an adequate remedy at law."  *Huu Nguyen v. Nissan N. Am., Inc.*, No. 16-CV-05591-LHK, 2017 WL 1330602, at *4 (N.D. Cal. Apr. 11, 2017).

In *Sonner v. Supreme Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020), the Ninth Circuit highlighted the "fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority."  According to the *Sonner* court, "[u]nder these principles, [a plaintiff] must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL . . . ."  *Id.* at 844.  Thus, the court upheld a district court's dismissal of UCL claims where "the operative complaint d[id] not allege that [plaintiff] lacks an adequate legal remedy."  *Id.*  In a subsequent opinion, the Ninth Circuit clarified its earlier decision and explained once more that dismissal of a UCL claim "was appropriate" where the plaintiff "could not show that she that she lacked an adequate remedy at law."  *Sonner v. Premier Nutrition Corp.* ("Sonner II"), 49 F.4th 1300, 1302 (9th Cir. 2022).

Following the Ninth Circuit's decisions in *Sonner* and *Sonner II*, courts have held that "[t]he question" at the pleading stage "[becomes] [] whether Plaintiffs have pled that they lack an adequate remedy at law."  *Subaru*, 2021 WL 1207791, at *29; *Huu Nguyen*, 2017 WL 1330602, at *4.  Where plaintiffs did not allege that legal remedies would be inadequate, courts have dismissed the plaintiff's claims for equitable relief.  *Subaru*, 2021 WL 1207791, at *29 (noting

that UCL claim should be dismissed where plaintiffs "have not explained how injunctive relief would cure their CLRA injury as pled, or alleged facts showing that legal remedies are inadequate"); *Rains v. Jaguar Land Rover N. Am., LLC*, No. 22CV4370 (EP) (JSA), 2023 WL 6234411, at *8 (D.N.J. Sept. 26, 2023) (dismissing UCL claim where, "though Plaintiffs seek alternative relief through an injunction, the FAC lacks any allegations as to why legal relief is inadequate. The FAC merely states it is seeking an injunction, not why that injunction is necessary").

Plaintiffs contend, however, that "[a]mple legal authority permits Plaintiffs to plead unjust enrichment claims in the alternative." D.I. 25 at 32. While the Court agrees that Plaintiffs may seek injunctive relief as an alternative to legal damages, in doing so, Plaintiffs must allege that legal remedies would not adequately compensate Plaintiffs for their damages. Because the FAC makes no such allegations,[10] Ford's motion to dismiss Plaintiffs' claims for equitable relief is GRANTED without prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS-IN-PART and DENIES-IN-PART Ford's Motion to Dismiss (D.I. 23). An appropriate Order will follow.

---

[10] Plaintiffs' allegations claiming that Plaintiffs lost confidence in their vehicles' ability to provide transportation and lost confidence in the veracity of Ford's advertising are not sufficiently tied to Plaintiffs' requested injunctive relief to support Plaintiffs' claims for injunctive relief. *Compare* D.I.15, ¶¶ 30, 45, 63, 80, 96, 115, 134, 160, 177, 195, 212 *with* D.I. 15, ¶¶ 695-708 (failing to plead lack of adequate remedy at law).